**EDWARDS v. UNITED STATES.**

No. 8386.

Circuit Court of Appeals, Ninth Circuit.

July 22, 1937.

E. V. Knauf, Harry J. McClean, and Erwin H. Haas, all of Los Angeles, Cal., and Henry Wenzlaff, of San Bernardino, Cal., by Harry J. McClean, of Los Angeles, Cal., for appellant.

Peirson M. Hall, U. S. Atty., of Los Angeles, Cal., and W. Carroll Hunter, Atty., U. S. Dept. of Agriculture, of Washington, D. C., and Wendell Berge and John S. L. Yost, Sp. Assts. to Atty. Gen., and Mastin G. White, Sol., U. S. Dept. of Agriculture, and Joseph G. Blandi, Atty., U. S. Dept. of Agriculture, both of Washington, D. C., for the United States.

Thos. B. Adams, of Jacksonville, Fla., and Wm. N. Ellis and J. J. Parrish, Jr., both of Orlando, Fla., amici curiæ.

Before GARRECHT, DENMAN, and HANEY, Circuit Judges.

DENMAN, Circuit Judge:

This proceeding is an appeal from a decree ordering a permanent injunction restraining the appellant from shipping in interstate or foreign commerce any oranges or grapefruit grown in California or Arizona in violation of orders of the Secretary of Agriculture made pursuant to the Agricultural Adjustment Act. The appellant, a shipper of oranges, admits the facts necessary to the District Court's jurisdiction, that the order complies with the provision of the act and that he has violated it. He states his appeal "is a test case to determine the constitutionality of the Agricultural Adjustment Act," and confines the appeal to three assignments of error, being the only assignments specified in his brief or discussed at the hearing:

"Specifications of Errors Relied Upon.

"I. The holding by the court that the provisions of Title I of the Agricultural Adjustment Act are constitutional and not in contravention of section 1 of article 1 of the Constitution of the United States.

"II. The holding by the court that the provisions of Title I of the Agricultural Adjustment Act are constitutional and not in contravention of the Fifth Amendment of the Constitution of the United States.

"III. The holding by the court that the provisions of Title I of the Agricultural Adjustment Act are constitutional and not in contravention of the Tenth Amendment of the Constitution of the United States."

We have adopted the government's brief's analysis of the act, description of the order and statement of fact showing the condition of the citrus industry and appellant's relation to it and the existence of a justiciable controversy, because of the excellence of the summary and the admission and acceptance by appellant in his briefs and at the hearing of the facts as stated.

I. The Applicable Provisions of the Act.

The Agricultural Adjustment Act, as originally enacted, was approved May 12, 1933 (48 Stat. 31, 7 U.S.C.A. § 601 et seq.). The act has been amended from time to time, but, for the purpose of this case, the most important amendatory act is that of August 24, 1935. (49 Stat. 750). The act contains many provisions not applicable to this case. The applicable provisions are set forth in the footnote hereto.[1] These pro-

---

[1] Act of May 12, 1933, amended August 24, 1935, 48 Stat. 31, 49 Stat. 750, 7 U.S.C.A. § 601, et seq.

"Title I—Agricultural Adjustment
"Sec. 1. [§ 601]. Declaration of Emergency. The present acute economic emer-

visions may principally be found in Title I, sections 1, 2, 8b, and 8c (7 U.S.C.A. §§ 601, 602, 608b, 608c).

The act first recites that the normal currents of commerce in agricultural commodities have been burdened and obstructed by gency being in part the consequence of a severe and increasing disparity between the prices of agricultural and other commodities, which disparity has largely destroyed the purchasing power of farmers for industrial products, has broken down the orderly exchange of commodities, and has seriously impaired the agricultural assets supporting the national credit structure, it is hereby declared that these conditions in the basic industry of agriculture have affected transactions in agricultural commodities with a national public interest, have burdened and obstructed the normal currents of commerce in such commodities, and render imperative the immediate enactment of title I of this Act [this chapter.]

"Sec. 2. [§ 602.] Declaration of Policy. It is hereby declared to be the policy of Congress—

(1) Through the exercise of the powers conferred upon the Secretary of Agriculture under this title [chapter], to establish and maintain such balance between the production and consumption of agricultural commodities, and such marketing conditions therefor, as will reestablish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period. The base period in the case of all agricultural commodities except tobacco and potatoes shall be the prewar period, August 1909-July 1914. In the case of tobacco and potatoes, the base period shall be the postwar period, August 1919-July 1929, and, in the case of all commodities for which the base period is the prewar period, August 1909 to July 1914, will also reflect current interest payments per acre on farm indebtedness secured by real estate and tax payments per acre on farm real estate, as contrasted with such interest payments and tax payments during the base period. * * *

"Sec. 8b [§ 608b]. In order to effectuate the declared policy of this title [chapter], the Secretary of Agriculture shall have the power, after due notice and opportunity for hearing, to enter into marketing agreements with processors, producers, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof, only with respect to such handling as is in the current of interstate or foreign commerce or which directly burdens, ob-structs, or affects, interstate or foreign commerce in such commodity or product thereof. The making of any such agreement shall not be held to be in violation of any of the antitrust laws of the United States, and any such agreement shall be deemed to be lawful: *Provided*, That no such agreement shall remain in force after the termination of this Act [chapter]. For the purpose of carrying out any such agreement the parties thereto shall be eligible for loans from the Reconstruction Finance Corporation under section 5 of the Reconstruction Finance Corporation Act [section 605 of Title 15]. Such loans shall not be in excess of such amounts as may be authorized by the agreements.

"Sec. 8c [§ 608c]. (1) Orders. The Secretary of Agriculture shall, subject to the provisions of this section, issue, and from time to time amend, orders applicable to processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof specified in subsection (2) of this section. Such persons are referred to in this title [chapter] as 'handlers.' Such orders shall regulate, in the manner hereinafter in this section provided, only such handling of such agricultural commodity, or product thereof, as is in the current of interstate or foreign commerce, or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof.

"(2) Commodities to which Applicable. Orders issued pursuant to this section shall be applicable only to the following agricultural commodities and the products thereof (except products of naval stores), or to any regional, or market classification of any such commodity or product: Milk, fruits (including pecans and walnuts but not including apples and not including fruits, other than olives, for canning), tobacco, vegetables (not including vegetables, other than asparagus, for canning), soybeans and naval stores as included in the Naval Stores Act [sections 91 to 99 of this title], and standards established thereunder (including refined or partially refined oleoresin).

"(3) Notice and Hearing. Whenever the Secretary of Agriculture has reason to believe that the issuance of an order will tend to effectuate the declared policy of this title [chapter] with respect to any commodity or product thereof specified in subsection (2) of this section, he shall give due notice of and an oppor-

the severe disparity between the prices of agricultural commodities and the prices of industrial products which disparity has resulted in the substantial destruction of the purchasing power of farmers for industrial products and the breaking down of the or-

tunity for a hearing upon a proposed order.

"(4) Finding and Issuance of Order. After such notice and opportunity for hearing, the Secretary of Agriculture shall issue an order if he finds, and sets forth in such order, upon the evidence introduced at such hearing (in addition to such other findings as may be specifically required by this section) that the issuance of such order and all of the terms and conditions thereof will tend to effectuate the declared policy of this title [chapter] with respect to such commodity. * * *

"(6) Terms—Other Commodities. In the case of fruits (including pecans and walnuts but not including apples and not including fruits, other than olives, for canning) and their products, tobacco and its products, vegetables (not including vegetables, other than asparagus, for canning) and their products, soybeans and their products, and naval stores as included in the Naval Stores Act [sections 91 to 99 of this title] and standards established thereunder (including refined or partially refined oleoresin), orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7)) no others:

"(A) Limiting, or providing methods for the limitation of, the total quantity of any such commodity or product, or of any grade, size, or quality thereof, produced during any specified period or periods, which may be marketed in or transported to any or all markets in the current of interstate or foreign commerce or so as directly to burden, obstruct, or affect interstate or foreign commerce in such commodity or product thereof, during any specified period or periods by all handlers thereof.

"(B) Allotting, or providing methods for allotting, the amount of such commodity or product, or any grade, size, or quality thereof, which each handler may purchase from or handle on behalf of any and all producers thereof, during any specified period or periods, under a uniform rule based upon the amounts produced or sold by such producers in such prior period as the Secretary determines to be representative, or upon the current production or sales of such producers, or both, to the end that the total quantity thereof to be purchased or handled during any specified period or periods shall be apportioned equitably among producers.

"(C) Allotting, or providing methods for allotting, the amount of any such commodity or product, or any grade, size, or quality thereof, which each handler may market in or transport to any or all markets in the current of interstate or foreign commerce or so as directly to burden, obstruct, or affect interstate or foreign commerce in such commodity or product thereof, under a uniform rule based upon the amounts which each such handler has available for current shipment, or upon the amounts shipped by each such handler in such prior period as the Secretary determines to be representative, or both, to the end that the total quantity of such commodity or product, or any grade, size, or quality thereof, to be marketed in or transported to any or all markets in the current of interstate or foreign commerce or so as directly to burden, obstruct, or affect interstate or foreign commerce in such commodity or product thereof, during any specified period or periods shall be equitably apportioned among all of the handlers thereof.

"(D) Determining, or providing methods for determining, the existence and extent of the surplus of any such commodity or product, or of any grade, size, or quality thereof, and providing for the control and disposition of such surplus, and for equalizing the burden of such surplus elimination or control among the producers and handlers thereof.

"(E) Establishing, or providing for the establishment of, reserve pools of any such commodity or product, or of any grade, size, or quality thereof, and providing for the equitable distribution of the net return derived from the sale thereof among the persons beneficially interested therein.

"(7) In the case of the agricultural commodities and the products thereof specified in subsection (2) orders shall contain one or more of the following terms and conditions:

"(A) Prohibiting unfair methods of competition and unfair trade practices in the handling thereof.

"(B) Providing that (except for milk and cream to be sold for consumption in fluid form) such commodity or product thereof, or any grade, size, or quality thereof shall be sold by the handlers thereof only at prices filed by such handlers in the manner provided in such order.

"(C) Providing for the selection by the Secretary of Agriculture, or a method

derly exchange of all commodities. It then makes provision, in its declaration of policy, for the issuance by the Secretary of Agri- culture of orders regulating in a prescribed manner only such handling of specified agricultural commodities as is in the current of

for the selection, of an agency or agencies and defining their powers and duties, which shall include only the powers:

(i) To administer such order in accordance with its terms and provisions;

(ii) To make rules and regulations to effectuate the terms and provisions of such order;

(iii) To receive, investigate, and report to the Secretary of Agriculture complaints of violations of such order; and

(iv) To recommend to the Secretary of Agriculture amendments to such order.

"No person acting as a member of an agency established pursuant to this paragraph (C) shall be deemed to be acting in an official capacity, within the meaning of section 10 [610] (g) of this title, unless such person receives compensation for his personal services from funds of the United States.

"(D) Incidental to, and not inconsistent with, the terms and conditions specified in subsections (5), (6), and (7) and necessary to effectuate the other provisions of such order.

"(8) Except as provided in subsection (9) of this section, no order issued pursuant to this section shall become effective until the handlers (excluding cooperative associations of producers who are not engaged in processing, distributing, or shipping the commodity or product thereof covered by such order) of not less than 50 per centum of the volume of the commodity or product thereof covered by such order which is produced or marketed within the production or marketing area defined in such order have signed a marketing agreement, entered into pursuant to section 8b [608b] of this title, which regulates the handling of such commodity or product in the same manner as such order, except that as to citrus fruits produced in any area producing what is known as California citrus fruits no order issued pursuant to this subsection (8) shall become effective until the handlers of not less than 80 per centum of the volume of such commodity or product thereof covered by such order have signed such a marketing agreement: Provided, That no order issued pursuant to this subsection shall be effective unless the Secretary of Agriculture determines that the issuance of such order is approved or favored:

"(A) By at least two-thirds of the producers who (except that as to citrus fruits produced in any area producing what is known as California citrus fruits said order must be approved or favored by three-fourths of the producers), during a representative period determined by the Secretary, have been engaged, within the production area specified in such marketing agreement or order, in the production for market of the commodity specified therein, or who, during such representative period, have been engaged in the production of such commodity for sale in the marketing area specified in such marketing agreement, or order, or

"(B) By producers who, during such representative period, have produced for market at least two-thirds of the volume of such commodity produced for market within the production area specified in such marketing agreement or order, or who, during such representative period, have produced at least two-thirds of the volume of such commodity sold within the marketing area specified in such marketing agreement or order.

"(9) Orders with or Without Marketing Agreement. Any order issued pursuant to this section shall become effective in the event that, notwithstanding the refusal or failure of handlers (excluding cooperative associations of producers who are not engaged in processing, distributing, or shipping the commodity or product thereof covered by such order) of more than 50 per centum of the volume of the commodity or product thereof (except that as to citrus fruits produced in any area producing what is known as California citrus fruits said per centum shall be 80 per centum) covered by such order which is produced or marketed within the production or marketing area defined in such order to sign a marketing agreement relating to such commodity or product thereof, on which a hearing has been held, the Secretary of Agriculture, with the approval of the President, determines:

"(A) That the refusal or failure to sign a marketing agreement (upon which a hearing has been held) by the handlers (excluding cooperative associations of producers who are not engaged in processing, distributing, or shipping the commodity or product thereof covered by such order) of more than 50 per centum of the volume of the commodity or product thereof (except that as to citrus fruits produced in any area producing what is known as California citrus fruits said per centum shall be 80 per centum) specified therein which is produced or marketed within the production or marketing area specified therein tends to pre-

interstate or foreign commerce, or which directly affects such commerce in such commodities. This is for the purpose of establishing and maintaining such marketing conditions for such commodities as will reestablish prices to farmers at a level that

vent the effectuation of the declared policy of this title with respect to such commodity or product, and

"(B) That the issuance of such order is the only practical means of advancing the interests of the producers of such commodity pursuant to the declared policy, and is approved or favored:

"(i) By at least two-thirds of the producers (except that as to citrus fruits produced in any area producing what is known as California citrus fruits said order must be approved or favored by three-fourths of the producers) who, during a representative period determined by the Secretary, have been engaged, within the production area specified in such marketing agreement or order, in the production for market of the commodity specified therein, or who, during such representative period, have been engaged in the production of such commodity for sale in the marketing area specified in such marketing agreement, or order, or

"(ii) By producers who, during such representative period, have produced for market at least two-thirds of the volume of such commodity produced for market within the production area specified in such marketing agreement or order, or who, during such representative period, have produced at least two-thirds of the volume of such commodity sold within the marketing area specified in such marketing agreement or order.

"(10) Manner of Regulation and Applicability. No order shall be issued under this section unless it regulates the handling of the commodity or product covered thereby in the same manner as, and is made applicable only to persons in the respective classes of industrial or commercial activity specified in, a marketing agreement upon which a hearing has been held. No order shall be issued under this title prohibiting, regulating, or restricting the advertising of any commodity or product covered thereby, nor shall any marketing agreement contain any provision prohibiting, regulating, or restricting the advertising of any commodity or product covered by such marketing agreement.

"(11) Regional Application. (A) No order shall be issued under this section which is applicable to all production areas or marketing areas, or both, of any commodity or product thereof unless the Secretary finds that the issuance of several orders applicable to the respective regional production areas or regional marketing areas, or both, as the case may be, of the commodity or product would not effectively carry out the declared policy of this title [chapter].

"(B) Except in the case of milk and its products, orders issued under this section shall be limited in their application to the smallest regional production areas or regional marketing areas, or both, as the case may be, which the Secretary finds practicable, consistently with carrying out such declared policy.

"(C) All orders issued under this section which are applicable to the same commodity or product thereof shall, so far as practicable, prescribe such different terms, applicable to different production areas and marketing areas, as the Secretary finds necessary to give due recognition to the differences in production and marketing of such commodity or product in such areas.

"(12) Cooperative Association Representation. Whenever, pursuant to the provisions of this section, the Secretary is required to determine the approval or disapproval of producers with respect to the issuance of any order, or any term or condition thereof, or the termination thereof, the Secretary shall consider the approval or disapproval by any cooperative association of producers, bona fide engaged in marketing the commodity or product thereof covered by such order, or in rendering services for or advancing the interests of the producers of such commodity, as the approval or disapproval of the producers who are members of, stockholders in, or under contract with, such cooperative association of producers.

"(13) Retailer and Producer Exemption. (A) No order issued under subsection (9) of this section shall be applicable to any person who sells agricultural commodities or products thereof at retail in his capacity as such retailer, except to a retailer in his capacity as a retailer of milk and its products.

"(B) No order issued under this title [chapter] shall be applicable to any producer in his capacity as a producer.

"(14) Violation of Order. Any handler subject to an order issued under this section, or any officer, director, agent, or employee of such handler, who violates any provision of such order (other than a provision calling for payment of a pro rata share of expenses) shall, on conviction, be fined not less than $50 or more than $500 for each such violation, and each day during which such violation continues shall be deemed a separate violation: Provided, That if the court

will give such commodities a purchasing power with respect to articles farmers buy equivalent to that which obtained in a prior period, in this case, the pre-war period August, 1909, to July, 1914. The protection of the consumer is provided for by the require-

finds that a petition pursuant to subsection (15) of this section was filed and prosecuted by the defendant in good faith and not for delay, no penalty shall be imposed under this subsection for such violations as occurred between the date upon which the defendant's petition was filed with the Secretary, and the date upon which notice of the Secretary's ruling thereon was given to the defendant in accordance with regulations prescribed pursuant to subsection (15).

"(15) Petition by Handler and Review. (A) Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition, in accordance with regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law.

"(B) The District Courts of the United States (including the Supreme Court of the District of Columbia) in any district in which such handler is an inhabitant, or has his principal place of business, are hereby vested with jurisdiction in equity to review such ruling, provided a bill in equity for that purpose is filed within twenty days from the date of the entry of such ruling. Service of process in such proceedings may be had upon the Secretary by delivering to him a copy of the bill of complaint. If the court determines that such ruling is not in accordance with law, it shall remand such proceedings to the Secretary with directions either (1) to make such ruling as the court shall determine to be in accordance with law, or (2) to take such further proceedings as, in its opinion, the law requires. The pendency of proceedings instituted pursuant to this subsection (15) shall not impede, hinder, or delay the United States or the Secretary of Agriculture from obtaining relief pursuant to section 8a (6) [608a(6)] of this title. Any proceedings brought pursuant to section 8a (6) [608a(6)] of this title (except where brought by way of counterclaim in proceedings instituted pursuant to this subsection (15) shall abate whenever a final decree has been render-

ed in proceedings between the same parties, and covering the same subject matter, instituted pursuant to this subsection (15).

"(16) Termination of Orders and Marketing Agreements. (A) The Secretary of Agriculture shall, whenever he finds that any order issued under this section, or any provision thereof, obstructs or does not tend to effectuate the declared policy of this title, terminate or suspend the operation of such order or such provision thereof.

"(B) The Secretary shall terminate any marketing agreement entered into under section 8b [608b of this title], or order issued under this section, at the end of the then current marketing period for such commodity, specified in such marketing agreement or order, whenever he finds that such termination is favored by a majority of the producers who, during a representative period determined by the Secretary, have been engaged in the production for market of the commodity specified in such marketing agreement or order, within the production area specified in such marketing agreement or order, or who, during such representative period, have been engaged in the production of such commodity for sale within the marketing area specified in such marketing agreement or order: Provided, That such majority have, during such representative period, produced for market more than 50 per centum of the volume of such commodity produced for market within the production area specified in such marketing agreement or order, or have, during such representative period, produced more than 50 per centum of the volume of such commodity sold in the marketing area specified in such marketing agreement or order, but such termination shall be effective only if announced on or before such date (prior to the end of the then current marketing period) as may be specified in such marketing agreement or order.

"(C) The termination or suspension of any order or amendment thereto or provision thereof, shall not be considered an order within the meaning of this section.

"(17) Provisions Applicable to Amendments. The provisions of this section, section 8d, and section 8e [608d, and 608e of this title] applicable to orders shall be applicable to amendments to orders: Provided, That notice of a hearing upon a proposed amendment to any order issued pursuant to section 8c [this section].

ment of a gradual approach to the desired level of farmer purchasing power and by the prohibition of any action which has for its purpose the establishment of a higher level. Sections 1, 2, 8c (1, 2), 7 U.S.C.A. §§ 601, 602, 608c (1, 2).

The Secretary is empowered not only, but required, to issue such orders. Section 8c (1, 4) 7 U.S.C.A. § 608c (1, 4). Orders may also be issued in cooperation with regulations within the jurisdiction, and under the authority, of any state. Section 10 (i) 7 U.S.C.A. § 610(i).

Orders are applicable to processors, associations of producers, and others engaged in the handling of such commodities, and producers, in their capacity as such, are specifically exempted from regulation. Section 8c (1), (13)(B), 7 U.S.C.A. § 608c(1), (13)(B).

The commodities subject to such regulation, with inapplicable exceptions, are milk, fresh fruits, fresh vegetables, tobacco, soy beans, and naval stores. Section 8c (2), 7 U.S.C.A. § 608c(2). The manner of regulation is carefully circumscribed. As applicable to this case, there may be (a) a limitation of the total quantity of any such commodity which may be marketed in or transported to any or all markets in the current of interstate or foreign commerce, or so as directly to affect such commerce in such commodity, and (b) an allotment of this total quantity among handlers under a uniform rule based upon the quantity which each handler has available for current shipment, to the end that the total quantity may be equitably apportioned among all handlers. Section 8c (6) (A, C), 7 U.S.C.A. § 608c (6) (A, C). There are special provisions for milk. Section 8c (5), 7 U.S.C.A. § 608 c (5).

The order may provide (a) for the selection by the Secretary of an agency to administer the provisions of the order, (b) for the payment to such agency by each handler of his pro rata share of the expenses of administering the order, as such expenses are

given not less than three days prior to the date fixed for such hearing, shall be deemed due notice thereof."

Sec. 10. (b) "(2) Each order issued by the Secretary under this title [chapter] shall provide that each handler subject thereto shall pay to any authority or agency established under such order such handler's pro rata share (as approved by the Secretary) of such expenses as the Secretary may find will necessarily be incurred by such authority or agency, during any period specified by him, for the maintenance and functioning of such authority or agency, other than expenses incurred in receiving, handling, holding, or disposing of any quantity of a commodity received, handled, held, or disposed of by such authority or agency for the benefit or account of persons other than handlers subject to such order. The pro rata share of the expenses payable by a cooperative association of producers shall be computed on the basis of the quantity of the agricultural commodity or product thereof covered by such order which is distributed, processed, or shipped by such cooperative association of producers. Any such authority or agency may maintain in its own name, or in the names of its members, a suit against any handler subject to an order for the collection of such handler's pro rata share of expenses. The several District Courts of the United States are hereby vested with jurisdiction to entertain such suits regardless of the amount in controversy. * * *

"(i) The Secretary of Agriculture upon the request of the duly constituted authorities of any State is directed, in order to effectuate the declared policy of this title [chapter] and in order to obtain uniformity in the formulation, administration, and enforcement of Federal and State programs relating to the regulation of the handling of agricultural commodities or products thereof, to confer with and hold joint hearings with the duly constituted authorities of any State, and is authorized to cooperate with such authorities; to accept and utilize, with the consent of the State, such State and local officers and employees as may be necessary; to avail himself of the records and facilities of such authorities; to issue orders (subject to the provisions of section 8c [608c of this title]) complementary to orders or other regulations issued by such authorities; and to make available to such State authorities the records and facilities of the Department of Agriculture: Provided, That information furnished to the Secretary of Agriculture pursuant to section 8d (1) hereof [608d (1) of this title] shall be made available only to the extent that such information is relevant to transactions within the regulatory jurisdiction of such authorities, and then only upon a written agreement by such authorities that the information so furnished shall be kept confidential by them in a manner similar to that required of Federal officers and employees under the provisions of section 8d (2) hereof [608d (2) of this title]."

determined by the Secretary, (c) for the prohibition of unfair methods of competition and unfair trade practices in the handling of the commodity under regulation, and (d) for such other matters as are incidental to, and not inconsistent with, the foregoing provisions and necessary to effectuate the same. Sections 8c (7) and 10 (b) (2), 7 U.S.C.A. §§ 608c (7), 610 (b) (2).

The effectiveness of any order is dependent upon the determination by the Secretary that the order is approved or favored by a given percentage in number or volume of the producers (two-thirds in volume in the instant case), and upon the execution of a marketing agreement, with like manner of regulation, entered into by the Secretary with handlers of a given percentage of volume (80 per cent. in the instant case of California citrus fruits). However, an order, having the requisite producer approval, may, notwithstanding the refusal of handlers in sufficient volume to sign a marketing agreement, be issued by the Secretary with the approval of the President. Section 8c (8, 9, 10), 7 U.S.C.A. § 608c (8–10). In determining the approval or disapproval of producers, the Secretary is required to consider the action of cooperative associations in this respect as the action of their affiliated producers. Section 8c (12), 7 U.S.C.A. § 608c (12).

[1] As a condition precedent to the issuance of an order, there must be a hearing upon a proposed order, and a finding by the Secretary, based upon evidence introduced at such hearing, that the issuance of the order will tend to effectuate the declared policy of the act. Section 8c (3, 4), 7 U.S. C.A. § 608c (3, 4). Hearings are also required as a condition precedent to the making by the Secretary of any marketing agreement. Section 8b, 7 U.S.C.A. § 608b.[2]

There are provisions relating to (a) regional application of orders [section 8c (11), 7 U.S.C.A. § 608c (11)], (b) amendments to orders [section 8c (17), 7 U.S.C.A. § 608c (17)], (c) termination of orders [section 16), 7 U.S.C.A. § 608c (16)], and (d) penalty for the violation of any orders

respecting which penalty any handler may have (a) immunity during the pendency of a petition filed by him with the Secretary of Agriculture alleging invalidity of the order and (b) a judicial review of the ruling of the Secretary on the petition. Section 8c (14, 15), 7 U.S.C.A. § 608c (14, 15).

The validity of marketing agreements and licenses issued under the provisions of the act before the amendment of August 24, 1935, and outstanding at the time of such amendment, together with any act done pursuant thereto either before or after the enactment of the amendatory act, is preserved by the amendatory act Public No. 320, 74th Congress, § 38, 49 Stat. 750, 7 U.S. C.A. § 608 note).

## II. The Applicable Provisions of the Order.

The order is known as Order No. 2—Order Regulating the Handling of Oranges and Grapefruit Grown in the States of California and Arizona. The order was issued pursuant to, and in accordance with, the applicable provisions of the act and in accordance with United States Department of Agriculture, Agricultural Adjustment Administration, General Regulations A No. 1 made pursuant to Title I, part 2, section 10 (c) of the Act, 7 U.S.C.A. § 610(c). The order was issued January 4, 1936, effective January 13, 1936. It contains the requisite findings of the Secretary based upon evidence introduced at a hearing upon a proposed order. It is applicable to shippers only, and the regulation prescribed therein relates specifically and exclusively to the shipping of such fruit in the current of interstate and of foreign commerce to Canada, or so as directly to burden, obstruct or affect such commerce in such fruit.

The order provides for weekly limitation from time to time of the total quantity of fruit which may be shipped in such commerce by all shippers and the allotment of such quantity among shippers and creates an agency, known as the California-Arizona Orange Grapefruit Agency, consisting of a Distribution Committee and a Growers' Ad-

---

[2] A brief, amicus curiæ, admitted on the suggestion of appellant's counsel at the submission of the appeal, attempts to raise the question whether the marketing agreement should follow or precede the hearing on the order. Such claim of error is unassigned and not for our consideration, since it is waived by appellant's brief and argument, expressly confining the appeal to the specifications of error above set forth, and is in violation of appellant's stipulation. The question concerns a step in the acquisition of the secretary's power to make the order. It does not affect the jurisdiction of the District Court to entertain the controversy and hence may be waived.

visory Committee, to administer the provisions of the order. The order provides for the determination of (a) the total quantity of fruit which, in consideration of specified current marketing factors, is deemed advisable to be shipped by all shippers during any given weekly period, (b) the prorate or allotment base of each shipper, which base is the ratio of the quantity of fruit under control by such shipper to the total crop grown in the States of California and Arizona, and ·(c) the allotment of each shipper · for the given proration period, which allotment is the product of such shipper's prorate base and the total advisable quantity for shipment. To obtain an allotment and a prorate base, each shipper is required to submit to the Growers' Advisory Committee written application therefor and estimates of fruit controlled by him during the current shipping season by bona fide written agreements giving authority to ship, or by having legal title, or by having paid therefor 5 per cent. of the purchase price. During any week for which the Secretary of Agriculture fixes allotments, no shipper shall ship any such fruit in excess of the quantity covered by his allotment for such week. Provision is made also for the exchange and transfer of allotments and for certain under and overshipments of allotments with later adjustment thereof.

The order provides also for the establishment of separate prorate districts, and specifies the factors to be considered in establishing such districts. The expense of administering the order is fixed, and provision is made for the equitable proration of such expense among handlers.

### III. Proceedings Under the Order.

In accordance with the provisions of the order, separate districts, known as prorate districts Nos. 1, 2, and 3, were established, and, respecting prorate district No. 2, there was determined, for weekly proration periods beginning respectively February 2, 9, 16, and 23, 1936, (a) the quantity of oranges for shipment in interstate commerce and in foreign commerce to Canada, (b) the prorate bases of shippers who applied therefor, and (c) the allotment of the quantity of oranges for shipment by each shipper who applied for an allotment.

### IV. The Nature and Extent of the Orange Industry.

(a) *Importance of the citrus crop.*— Oranges and grapefruit combined are the second most important fruit crop in the United States, being exceeded in total farm value by apples only. It is estimated that there are approximately 50,000 growers engaged in the United States in the commercial production of these two citrus fruits, and of this number more than 18,000 are located in California and Arizona. The United States farm value of oranges and grapefruit averaged $133,842,000 for the five year period, 1924-25 to 1928-29, declined rapidly following the year 1929-30, and by 1932-33 was only $68,716,000, or 51 per cent. of the previous level. - For California and Arizona alone, the decline was from $80,-982,000 to $36,013,000, or about 56 per cent., and for oranges alone, from $78,513,000 to $34,405,000, or 56 per cent. The farm value of oranges and grapefruit in the United States improved in 1933-34 to $89,588,000, or $20,872,000 more than in 1932-33, and still further improved in 1934-35 to $105,-256,000, or $36,540,000 more than in 1932-33. For California and Arizona alone, the farm value of oranges and grapefruit improved in 1933-34 to $48,231,000, an increase of $12,·-218,000 over the total in 1932-33, and improved in 1934-35 to $62,449,000, or $26,-436,000 more than in 1932-33. The improvement in farm value respecting California and Arizona oranges alone was from $34,-405,000 in 1932-33 to $45,787,000 in 1933-34, or over $11,000,000, and $34,405,000 in 1932-33 to $59,228,000 in 1934-35, or over $24,-800,000. In California, the farm value of the two citrus fruits is three times more than the farm value of any other fruit crop. In 1929 the farm value in California of the two citrus fruits amounted approximately to 41 per cent. of the farm value of all the principal fruit crops in that state and in 1932 the said percentage was 37 per cent.

(b) *Market supplies of oranges.*—The market supply of oranges has increased over a number of years and has continued to increase through a time when the buying power of the market was relatively low. The United States' shipments of oranges for fresh fruit markets averaged 46,663,000 boxes for the three seasons, 1932-33 to 1934-35, and represent an increase of 11,208,000 boxes over a three-year (1927-28—1929-30) pre-depression average of 35,455,000 boxes. In comparison with the earlier three-year period of 1922-23 to 1924-25, this represents an increase of 16,575,000 boxes. The market supply of oranges originating in California and Arizona account for the major portion of the total increase in the United States. Shipments in fresh fruit channels originating in these two states averaged 31,-134,000 boxes for the three recent seasons

of 1932-33 to 1934-35, while the shipments from these two states for the three seasons immediately preceding the depression averaged 25,000,000 boxes, and for the three earlier seasons, namely, 1922-23 to 1924-25, averaged approximately 19,494,000 boxes. Shipments in 1934-35 were the heaviest of record, and amounted to 36,475,000 boxes for California and Arizona, the total shipment from all commercial areas in the United States during such year reaching an approximate total of 51,577,000 boxes.

The United States' population has increased at a much slower rate than the market supply of oranges, the increase from 1925 to 1930 being less than 1.5 per cent. per year, and since 1930 the United States' continental population has increased at the rate of .6 per cent. per year. Since 1930, the market supply of oranges has increased more than ten times as rapidly as the population of the United States.

## V. Interstate and Foreign Commerce in Oranges.

Practically every family in the United States is a consumer of oranges, and a very substantial part of the consumptive demand is for such fruit as produced in, and marketed from, California and Arizona. Approximately 90 per cent. of the oranges produced in California move from points in that state to points in other states or foreign countries. Oranges are regularly sold by shippers in California and Arizona to wholesalers and retailers in many states of the United States, and the shipment of oranges pursuant to sale takes place principally by rail, truck, and boat. Shipments of oranges from either California or Arizona to other states of the United States are frequently made to wholesalers by whom the oranges are further shipped and distributed to buyers in still other states of the United States. Oranges grown in the States of California and Arizona are also extensively exported to many foreign countries, but principally to Canada and the United Kingdom. The exports of oranges from the United States consist principally of such fruits as produced in the states of California and Arizona. During the season 1935-36, the railroads of the United States shipped from the State of California to points outside said State an aggregate of 70,000 carloads of citrus fruits. There are more than 1,500 carlot wholesale dealers in citrus fruits in California and Arizona, and several thousand less-than-carlot wholesale deal-ers in such fruits thorughout the United States outside of California. Such dealers are located in more than 700 cities. Some of them handle other commodities. There are also over half a million retail citrus fruit outlets throughout the nation.

## VI. The Effectuation by the Order of the Declared Policy of the Act.

(a) *The resulting improvement in interstate and foreign commerce.*—The regulated flow to market of oranges, in accordance with the provisions of the act as applied by the order, tends to (1) a reasonably constant, dependable supply at the terminal markets by the avoidance of alternate gluts and famines, (2) a ready disposition of the fruit at terminal markets without expense and deterioration consequent upon holding, (3) a more accurate anticipation by railroads of the probable transportation requirements of the citrus industry, and (4) a more efficient conduct of railroad operations respecting the availability and flow of refrigerator cars, thereby promoting the confidence of dealers, increased market stabilization, higher standards of trade, protection to growers, handlers and consumers, and increased consumptive demand respecting such fruit.

(b) *Restoration of purchasing power.*— The regulatory provisions of the act, as applied by the order, by effecting an orderly movement of oranges in the channels of interstate commerce and of foreign commerce to Canada, tend to restore the purchasing power of oranges to the desired level. The price during the period of the transactions involved in this case which would give to oranges a purchasing power equivalent to that which obtained in the pre-war base period, August, 1909, to July, 1914, was $1.78 per box. This was known as the parity price. The parity price for any particular season is calculated by multiplying the average farm price of the base period by the Index of Prices Paid by Farmers in that season. The average farm price for oranges during the base period was $1.41 per box. The price index in February, 1936, was 126. During the marketing seasons beginning November, 1930, 1931, 1932, 1933, and 1934, growers' prices were $1.72, $1.29, $1.08, $1.67, and $1.46 per box, respectively. The price in each of said seasons was below parity and, for the five-year period mentioned above, averaged 19 per cent. below parity. The average farm price during the base period, and the parity price for any

subsequent season, are determinable by mathematical computations from available statistics compiled and published regularly over a period of many years by the Bureau of Agricultural Economics, an independent bureau established in the United States Department of Agriculture, and were so determined by the Secretary in the issuance of the order in this case.

The growers' unit price per box for the currently estimated 1935-1936 crop of 34,-652,000 boxes will, as a result of the regulatory provisions of the act, as applied by the order, exceed the prices received by growers during the 1934-35 season, and the total returns to growers will be greater than would be the case in the absence of such regulation. The indications are that prices to growers for the 1935-36 crop will approach, but not exceed, the parity price. The provisions of the act, as applied by the order, will effectuate also a gradual correction of the current level of growers' prices for oranges at as rapid a rate as the Secretary deemed to be in the public interest and feasible in view of the consumptive demand in domestic and foreign markets.

(c) *The benefit of past regulations.*— The marketing of oranges grown in California and Arizona during the crop seasons of 1933-34 and 1934-35, under regulations prescribed by the Secretary, pursuant to the licensing power of the act as in effect until August 24, 1935, resulted in improvement of interstate commerce and of foreign commerce to Canada in oranges, and in substantial benefit to the growers of such fruit.

VII. **The Nature, Extent, and Effect of the Appellant's Violations of the Provisions of the Act as Applied by the Order.**

The appellant, engaged in the business of purchasing oranges from growers in the State of California and processing, packing, and shipping the same, shipped, in the regular course of his business, during the several weekly proration periods aforesaid, nineteen carloads, containing in the aggregate 8,613 boxes, of navel and miscellaneous varieties of oranges, grown in prorate district No. 2, from Colton, San Bernardino county, Cal., located in the said prorate district, to points in several other states of the United States, namely, Great Falls, Mont.; Denver, Colo.; Butte, Mont.; Salt Lake City, Utah; El Paso, Tex.; Seattle, Wash.; and Portland, Ore., without having applied for an allotment and a prorate base, and without having procured in any manner an allotment fixed by the Secretary, covering any of said shipments, although the appellant was afforded full and ample opportunity so to do. The appellant has stated that, except as ordered to the contrary by the District Court, he will not in the future comply with the provisions of the act as applied by the order.

There is active competition for the interstate and Canadian market among all handlers of oranges grown in the States of California and Arizona and among intermediate handlers in other states, and the appellant conducts his business in active and substantial competition with other handlers of oranges complying with the provisions of the act as applied by the order. The effect of the appellant's violation of these provisions has been to impair the effectiveness of the program inaugurated by the act, as applied by the order, regulating the handling of oranges in interstate commerce and in foreign commerce to Canada, to disrupt and obstruct such commerce in such fruit, to render partially ineffective the lawful regulation of such commerce, as provided in the act and order, to bring about unstabilized marketing conditions respecting such commerce which have injured and burdened the orange industry, and to defeat the policy of Congress, declared in the act, to promote the orderly exchange of commodities among the several states of the United States and with foreign nations.

VIII. **Judicial Notice Taken that the Agricultural Adjustment Act and the Secretary's Order Affect Certainly though Incalculably (a) the Planting of Citrus Trees within the two States and the Abandonment of Border-Line Orchards and (b) the Price Both of the Decreased Export and Increased Intrastate Remainder of the Crop.**

In addition to these facts, admitted by the appellant, we take judicial notice that the planting of a commercial citrus orchard has as its major objective and profit motive the ultimate shipment into interstate commerce of the larger part of its product. The owner enters into the nation-wide citrus industry and his profit is in a large degree dependent upon the extrastate consumption of the fruit. National Labor Relations Board v. Friedman-Marks Clothing Co., 57 S.Ct. 645, 81 L.Ed. ——, 108 A.L.R. 1352.

In a very true sense the proximate causes (or bipartite cause) of interstate

citrus commerce are the creation of orchards whose fruit is intended by the owners to enter that commerce and the demand in other consuming states for its product. The orchards are the springs from which flow the streams of that commerce. The consumers' demands channel the streams through the states.

The citrus producing area of California and Arizona extends from Oroville in the Sacramento Valley foothills of the Sierra-Nevada Range, southerly through California, to the southern boundary of Arizona, a distance of over 700 miles. Though citrus production has been established in this area for many decades, its acreage has constantly expanded. Aging, frostbitten, and otherwise defective and dead trees are constantly replaced. As in all pioneer planting of orchards, the untried soil, water, heat, or frost conditions often made it a borderline investment.

The effect of a prohibition of shipment into interstate commerce of the amount necessary to effectuate the purposes of the act will diminish the planting of new acreage in periods of high prices for the fruit, cause the abandonment of border-line groves, and the replacement of dead or lesser producing trees. This is a certain effect, inevitable under a capitalistic economy, vitalized by the profit motive. That the effect is not accurately calculable does not make it any less a certain result of the diminishing of export from the states. In principle, this certain but incalculable effect is not unlike that arising from the high tariff duties levied by the Congress with the declared purpose of decreasing the volume of entering foreign imports and its competition with domestic production.

Similarly, we notice that such limitation of citrus export from these two states certainly though incalculably will increase the price of this lesser amount to be shipped over the price realizable if all had been shipped.

We further notice that the limitation of shipments out of the state will increase the volume to be disposed of within the state with an inevitable effect on the price of the increased volume of intrastate consumption of citrus products or in the change of use of the products, such as for grapefruit and orange juice.

IX. Additional Facts, Rationally Conceivable, which the Court Must Attribute to the Congressional Intent in Considering the Constitutionality of the Act.

The control of commodities "to be" shipped in interstate commerce may prevent glutting of markets and thus avoid or lessen the intensity of economic depressions.

Such regulation may increase the total amount of the exchange of products between the agricultural and manufacturing states over the period covering the crest and trough of prosperity and depression of the business cycle.

█ In addition to these matters of judicial notice, we are required to consider the rationally conceivable facts attributable to the deliberation and belief of the Congress in enacting the agricultural adjustment legislation. This is under the rule stated in the opinion of Justice Bushrod Washington in Ogden v. Saunders, 12 Wheat. 213, 269, 270, 6 L.Ed. 606: "It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body, by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt," and more recently stated in Mr. Justice Van Devanter's opinion in. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369, Ann.Cas.1912C, 160: " * * * if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed."

Recently in construing certain provisions of the act of Congress in question here, the Supreme Court states the rule to be that: "Every presumption is to be indulged in favor of faithful compliance by Congress with the mandates of the fundamental law." United States v. Butler, 297 U.S. 1, 67, 56 S.Ct. 312, 320, 80 L.Ed. 477, 102 A.L.R. 914. Though its repetition may seem trite, it is an axiom of our judicial function that the acceptance of such conceivable congressional factual motivation is required of us, so far as it is humanly possible, with complete disregard of any doubt or conviction of its error from the viewpoint of our economic or policital predilections.

We take notice of the "constantly recurring burden on interstate commerce"[3] during the successive economic depressions of

---

[3] National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. —, 108 A.L.R. 1352.

780

the last hundred years, in which the larger railway carriers of the United States have been reduced to bankruptcy or receivership by the drop in volume of interstate-carried merchandise, due to the ability of consumers to purchase less than the average of the production of both the agricultural and manufacturing states. In a very true sense it is a rational concept that these uncontrolled depressions cause a "constantly recurring" "throttling" of interstate commerce.

We accept as a rational concept of fact in the congressional mind and motivation in the passage of the Agricultural Adjustment Act that, had the producers of agricultural products of the agrarian and fruit growing states continued to receive a fair average price for the prosperous periods preceding these depressions, they would have purchased more of the products of the manufacturing states. The added income of the manufacturers of the industrial states from such farmer and fruit growers would, in turn, have purchased more cereal and fruit products. This would tend to make larger the volume of interstate commerce, thus eliminating the burdens of depressions on interstate carriers or diminishing their weight or making them less "constantly recurring" in their "throttling" of such commerce.

We must also attribute to congressional motivation the rational concept of fact that, in the historic succession of economic depressions, interstate commerce plays a causative and devastating part in the overcrowding of markets, preceding their stagnation. The prevention of the use of interstate commerce in such overcrowding may ameliorate the economic prostration of the whole nation, with its thousands of bank failures and of foreclosures of homes and farms; its hundreds of thousands of bankruptcies; its crowding of the poorhouses; its malnutrition of the adolescent, with its consequent arrested mental and physical growth; its many unemployed millions on relief; and its trail of suicide, defalcation, and other crime.

It is in view of these noticed facts and rational hypotheses of fact, that the claims of the appellant that several of the provisions of the Constitution are violated by the Agricultural Adjustment Act and the order of the Secretary must be considered.

■ (1) Under the decision in National Labor Relations Board v. Jones & Laughlin Steel Corporation, 57 S.Ct. 615, 81 L.Ed.

——, 108 A.L.R. 1352, overruling Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160, Congress may directly regulate production of commodities to be shipped in interstate commerce. Hence it could directly regulate the planting and management of citrus orchards and marketing of fruit within a state under the profit motive of the sale of the major portion of the fruit to consumers in other states.

Since the greater includes the less, the Agricultural Adjustment Act may, as an incident to regulating the flow of oranges to be shipped out of California and Arizona, affect the price both of the lesser amount shipped out and the greater amount remaining in those states.

In a like way the act may affect the planting, maintenance or abandonment of citrus groves.

The certain but incalculable effect on production of the order and act here challenged is obviously less in its regulation than the direct control of the Guffey Coal Act, 15 U.S.C.A. §§ 801–827, held unconstitutional because expressly regulating the relationship of employer and employee in the intrastate activity of the production of coal.

Appellant's brief was filed prior to the decision of National Labor Relations Board v. Jones & Laughlin Steel Corporation, supra. At the hearing, appellant contended that the Carter Coal Case still controlled and that it was not overruled by the Jones & Laughlin decision. In both these decisions the congressional regulation of production acted directly upon the intrastate relationship of employer and employee. If the Carter Coal Case be overruled in respect of the holding in this regard, and the Congress have such power over intrastate production, as incidental to the exercise of its power over interstate commerce, a fortiori will it have the power of indirectly affecting citrus production incidental to its regulation of interstate shipments.

In the Jones & Laughlin Case iron and steel products were manufactured in the State of Pennsylvania from raw materials, a large percentage of which came from other states, while a similar large percentage (75 per cent.) of the manufactured product was shipped to and sold in other states. The Supreme Court held that although the manufacturing process was an intrastate activity, its labor disturbances, by which might be "throttled" interstate commerce with respect to the commodities "to

*be"* transported from Pennsylvania, came within the control of Congress. It is not the preceding interstate transportation of the raw materials to be processed which is the determinant.

The ratio decidendi of the Jones & Laughlin decision is summarized in the opinion of the Chief Justice, as follows (57 S.Ct. 615, 627, 81 L.Ed. ——, 108 A.L.R. 1352) : "The opinion in that case [Virginian R. Co. v. System Federation, 57 S.Ct. 592, 81 L.Ed. 789] also points to the large measure of success of the labor policy embodied in the Railway Labor Act [45 U.S.C.A. § 151 et seq.]. But with respect to the appropriateness of the recognition of self-organization and representation in the promotion of peace, the question is *not essentially different in the case of employees in industries of such a character that interstate commerce is put in jeopardy* from the case of employees of transportation companies. And of what avail is it to protect the facility of transportation, if interstate commerce is throttled with respect to the commodities TO BE transported." (Emphasis supplied).

The reasoning and authority of the Jones & Laughlin decision for the conclusion that the placing in jeopardy and throttling of commerce in products *"to be"* transported is within congressional regulatory power, disclaim that it is based upon the interruption of a flow of commerce in which there had been interstate transportation of the raw materials *to* the state of manufacture.

"We do not find it necessary to determine whether these features of defendant's business dispose of the asserted analogy to the 'stream of commerce' cases. The instances in which that metaphor has been used are but particular, and not exclusive, illustrations of the protective power which the government invokes in support of the present act. The congressional authority to protect interstate commerce from burdens and obstructions is not limited to transactions which can be deemed to be an essential part of a 'flow' of interstate or foreign commerce. Burdens and obstructions may be due to injurious action springing from other sources.

"The fundamental principle is that the power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement' * * * ; to adopt measures 'to promote its growth and insure its safety' * * * ; 'to foster, protect, control, and restrain.' * * * That power is plenary and may be exerted to protect interstate commerce 'no matter what the source of the dangers which threaten it.' * * * Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control. * * * Undoubtedly the scope of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what it national and what is local and create a completely centralized government. The question is necessarily one of degree. As the Court said in Board of Trade v. Olsen, supra; 262 U.S. 1, at page 37, 43 S.Ct. 470, 477, 67 L.Ed. 839, repeating what had been said in Stafford v. Wallace [258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229] : 'Whatever amounts to more or less constant practice, and threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, and it is primarily for Congress to consider and decide the fact of the danger and to meet it.'

"That intrastate activities, by reason of close and intimate relation to interstate commerce, may fall within federal control is demonstrated in the case of carriers who are engaged in both interstate and intrastate transportation. There federal control has been found essential to secure the freedom of interstate traffic from interference or unjust discrimination and to promote the efficiency of the interstate service. Shreveport Case (Houston, E. & W. T. R. Co. v. United States), 234 U.S. 342, 351, 352, 34 S.Ct. 833, 58 L.Ed. 1341; Railroad Commission of Wisconsin v. Chicago, B. & Q. R. Co., 257 U.S. 563, 588, 42 S.Ct. 232, 237, 66 L.Ed. 371, 22 A.L.R. 1086. It is manifest that intrastate rates deal *primarily* with a local activity. But in rate making they bear such a close relation to interstate rates that effective control of the one must embrace some control over the other. * * * It is said that this exercise of federal power has relation to the maintenance of adequate instrumentalities of interstate commerce. But the agency is not superior to the commerce which uses it. The protective

power extends to the former because it exists as to the latter.

"The close and intimate effect which brings the subject within the reach of federal power may be due to activities in relation to productive industry although the industry when separately viewed is local."

National Labor Relations Board v. Jones & Laughlin Steel Corporation, 57 S.Ct. 615, 81 L.Ed. ——, 108 A.L.R. 1352.

In Carter v. Carter Coal Co., 298 U.S. 238, 308, 309, 56 S.Ct. 855, 872, 80 L.Ed. 1160, one of the determinants of the decision is its negative answer to the argument that, because wage conditions and labor disputes were of "employees * * * not engaged in or about commerce, but exclusively in producing a commodity," "greatly" affect interstate commerce and cause "resulting strikes, curtailment, and irregularity of production and effect on prices," Congress may regulate the labor conditions in such production of the commodity to be transported.

The language of the Carter Case determining that employment in production within a state could not come within congressional control "however extensive" might be its effect on the interstate commerce in which it is to be transported, is as follows (298 U.S. 238, 308, 309, 56 S.Ct. 855, 871, 80 L.Ed. 1160): "Much stress is put upon the evils which come from the struggle between employers and employees over the matter of wages, working conditions, the right of collective bargaining, etc., and the resulting strikes, curtailment, and irregularity of production and effect on prices; and it is insisted that interstate commerce is greatly affected thereby. But, in addition to what has just been said, the conclusive answer is that the evils are all local evils over which the federal government has no legislative control. The relation of employer and employee is a local relation. At common law, it is one of the domestic relations. The wages are paid for the doing of local work. Working conditions are obviously local conditions. *The employees are not engaged in or about commerce, but exclusively in producing a commodity.* And the controversies and evils, which it is the object of the act to regulate and minimize, are local controversies and evils affecting local work undertaken to accomplish that local result. Such effect as they may have upon commerce, however extensive it may be, is secondary and indirect. *An increase in the greatness of the effect adds to its im-*

*portance. It does not alter its character."* (Italics supplied).

Four of the Justices joined in this opinion and holding. The concurrence of the Chief Justice is as follows: "I agree * * * that production—in this case mining—which precedes commerce is not itself commerce; and that the power to regulate commerce among the several states is not a power to regulate industry within the state." 298 U.S. at page 317, 56 S.Ct. at page 875, 80 L.Ed. 1160.

Since this holding is one of the "determinants" of the Carter decision, it is overruled by the Jones & Laughlin decision in the opening sentence of the paragraph of the opinion discussing the Carter Case in the following language (57 S.Ct. 615, 626, 81 L.Ed. ——, 108 A.L.R. 1352): "It is thus apparent that the fact that the employees here concerned were engaged in production is *not* determinative."

In stating, later in the same paragraph, that the Carter Case is "not controlling here," i. e., as to the provisions of the National Labor Relations Act (29 U.S.C.A. §§ 151–166), the opinion of the Chief Justice must mean not controlling in so far as it rests on considerations *other than* the effect on interstate commerce of labor conditions in the production of commodities. In the latter respect it would be controlling and compel the conclusion that the act was in violation of the Tenth Amendment to the Constitution. It is not "determinative" of this question, solely because it is overruled.

It is obvious that the prevention of the throttling of interstate commerce by strikes and labor disturbances will have a certain though incalculable effect on the price of the goods to be shipped, just as here the limitation of volume of export from the two states will have its certain though incalculable effect on the price, both of the lessened export and the larger amount of retained fruit. The controlling principle is the same.

So also with respect to the volume of production. Preventing strikes will increase volume. It involves no change of principle because along with the regulation of the flow of interstate commerce to prevent its throttling by economic depressions, production is deceased rather than increased. The restrictions on the interstate carriage of oleomargarine tended to decrease its production and sale and increase the production and price of butter made from milk. It was none the less within the regulatory power of Congress. Similarly with

the prohibition of the carriage of alcoholic liquors from states in which their sale was permitted into states prohibiting it. So with lottery tickets transported from states licensing their issuance into states making it a misdemeanor to sell them.

■ We therefore hold, under the Jones & Laughlin decision, that the Agricultural Adjustment Act and the orders in question are none the less within the regulatory power of Congress to remove the throttling effect on interstate commerce by recurring depressions because the regulations affect the volume and sales price either of merchandise produced within and carried out of the state or that produced and remaining within it. Appellant's contention that the act and orders are unconstitutional because of the Tenth Amendment is not well taken.

This conclusion is the same in principle as that reached by us in Wilshire Oil Co. v. United States, 77 F.(2d) 1022, April 15, 1935, relative to the control of intrastate production of oil as affecting the total volume shipped into interstate commerce.

(2) **Under the decision of Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407, the regulation of interstate commerce by the Agricultural Adjustment Act and the orders of the Secretary with the intent to prevent or ameliorate the evil and harm of economic depressions is within the federal police power and not contrary to the Fifth Amendment's provisions for liberty of contract.**

Appellant does not base his claim under the Fifth Amendment on the taking or destruction of any property right in existing contracts for the future delivery in another state of oranges and grapefruit. We are required to determine whether the act and orders infringe his liberty to make future contracts for such extra state deliveries.

What has been said with regard to the prohibitory congressional regulations affecting price and volume of production of oleomargarine, lottery tickets, and intoxicating liquors is of equal application to the owner's liberty to make in the future contracts for their sale. In each the effect of the regulation of interstate commerce is to reduce the liberty to contract to sell or to sell these articles to persons desiring to acquire them by shipment through interstate commerce.

The Supreme Court has held that the Congress may exercise "the police power, for the benefit of the public, within the field of interstate commerce." Brooks v.

United States, 267 U.S. 432, 436, 45 S.Ct. 345, 346, 69 L.Ed. 699, 37 A.L.R. 1407. It is a police power intended to facilitate the settlement of industrial disputes and lessen the threat of strikes, which the Jones & Laughlin Case holds is possessed by the Congress and directly and specifically exercised in the National Labor Relations Act (29 U.S. C.A. §§ 151–166).

■■ Chief Justice Taft's opinion in the Brooks Case states the controlling principle to be: "Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote * * * the *spread of any evil or harm to the people of other states from the state of origin.*" Brooks v. United States, supra, 267 U.S. 432, 436, 45 S.Ct. 345, 346, 69 L.Ed. 699, 37 A.L.R. 1407. The "evil or harm" which Congress has the police power to prevent by prohibitory regulation of interstate commerce is economic as well as to the human body, civil as well as criminal. The Chief Justice's opinion summarizes them as follows: "In Reid v. Colorado, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108, it was held that Congress could pass a law excluding diseased stock from interstate commerce in order to prevent its use in such a way as thereby to injure the stock of other states. In the Lottery Case, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492, it was held that Congress might pass a law punishing the transmission of lottery tickets from one state to another, in order to prevent the carriage of those tickets to be sold in other states and thus demoralize, through a spread of the gambling habit, individuals who were likely to purchase. In Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364, it was held that it was within the regulatory power of Congress to punish the transportation in interstate commerce of adulterated articles which if sold in other states from the one from which they were transported would deceive or injure persons who purchased such articles. In Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523, 43 L.R.A.(N.S.) 906, Ann.Cas. 1913E, 905, and Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas.1917B, 1168, the so-called White Slave Traffic Act [18 U.S. C.A. § 397 et seq.], which was construed to punish any person engaged in enticing a woman from one state to another for immoral ends, whether for commercial purposes or otherwise, was valid because it was intended to prevent the use of inter-

state commerce to facilitate prostitution or concubinage and other forms of immorality. In Clark Distilling Co. v. Western Maryland Railway Co., 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326, L.R.A.1917B, 1218, Ann.Cas. 1917B, 845, it was held that Congress had power to forbid the introduction of intoxicating liquors into any state in which their use was prohibited in order to prevent the use of interstate commerce to promote that which was illegal in the state. In Weber v. Freed, 239 U.S. 325, 36 S.Ct. 131, 60 L.Ed. 308, Ann.Cas.1916C, 317, it was held that Congress had power to prohibit the importation of pictorial representations of prize fights designed for public exhibition because of the demoralizing effect of such exhibitions in the state of destination." Brooks v. United States, supra, 267 U.S. 432, 437, 45 S.Ct. 345, 346, 69 L.Ed. 699, 37 A.L.R. 1407.

To these may be added the prevention of economic harm to dairymen in their competition with butter substitutes such as oleomargarine. Such prevention by the state is not a violation of the due process clause of the Fourteenth Amendment which in this respect is the same as the Fifth. Hammond Co. v. Montana, 233 U.S. 331, 333, 34 S.Ct. 596, 58 L.Ed. 985.

Oleo oil used in manufacture of oleomargarine may be prohibited by Congress from entering interstate carriage unless it has complied with the inspection rules of the United States meat inspectors. Pittsburgh Melting Co. v. Totten, 248 U.S. 1, 39 S.Ct. 3, 63 L.Ed. 97.

Applying the Hammond Case, it is within the federal police power to aid dairymen by prohibiting entirely its interstate carriage, without violation of the due process clause.

Grain may be prohibited from entering interstate commerce if not inspected by federal inspectors and classified according to their standards. Once the federal inspection is established, it ousts the authority of the state to impose its inspection. Shafer v. Farmers' Grain Co., 268 U.S. 189, 45 S. Ct. 481, 69 L.Ed. 909.

Marketing of grain in the Grain Exchange may be regulated as to future sales destroying the liberty to make certain sales contracts. Board of Trade v. Olsen, 262 U. S. 1, 4, 43 S.Ct. 470, 471, 67 L.Ed. 839.

Congress may prevent the carriage of prison made goods, innocuous in themselves, into states whose economic policy is to deprive the owner of his liberty to market them in competition with the products of free labor. Whitfield v. Ohio, 297 U.S. 431, 56 S.Ct. 532, 80 L.Ed. 778.

Clearly the "evil or harm" to which interstate commerce may contribute, includes what Congress may rationally conceive to be economic evil or harm.

The "evil or harm" of the cycles of depressions of abundance was recognized by economists and political scientists as long ago as 1848,[4] and then claimed to contain forces which combined with other unlimited competition in production and business would destroy the capitalistic democracies of the world. Since we are required to apply Mr. Justice Van Devanter's criterion of Lindsley v. Natural Carbonic Gas Co., supra, it is a rational hypothesis, of a fertility to cause the conception of the congressional intent, that the world depression after the war in Europe created the economic chaos in Italy which led to the dictatorship of Mussolini and later in Germany to the destruction of democratic capitalism there. It is not for us to appraise the truth of the Marxian thesis that depressions of abundance are aiding in the destruction of our capitalism, or to determine the political wisdom of the attempt by legislative regulation to defeat its claimed inevitability. However, it is no argument against the constitutionality of the Agricultural Adjustment Act that it is a novel exercise of the police power incidental to the regulation of the flow of commerce among the states for, as the Supreme Court observes in one of Mr. Justice Sutherland's opinions: "Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive." Euclid v. Ambler Co., 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303, 54 A.L.R. 1016.

Whether we consider the Congress to have exercised its police power to ameliorate economic depressions because of the immediate attendant evils we have partially summarized above, or with a stateman's consideration of the facts of the destruction of democratic government in Central Europe, or because of both, we find both con-

---

4 Manifesto by Marx and Engels, p. 327 et seq., The Modern Library Edition 1932.

cepts of fact are rational, and either supports the argicultural adjustment legislation against the challenge of constitutionality as violating liberty of contract.

**(3) There is no delegation of legislative authority in the Agricultural Adjustment Act. The regulatory orders of the Secretary are based on standards provided by the act. The act violates neither the legislative provisions of the first article of the Constitution nor the due process clause of the Fifth Amendment.**

We are required to consider the challenge of the appellant that the act delegates legislative and not administrative power under the long-established principle restated in the Jones & Laughlin decision. "The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same."

National Labor Relations Board v. Jones & Laughlin Steel Corporation, supra, 57 S.Ct. 615, 621, 81 L.Ed. —, 108 A.L.R. 1352.

Since the appellant admits the Secretary's orders are in full satisfaction of the requirements of the act, our sole inquiry is whether the act delegates legislative authority rather than administrative duty. Nor does appellant object to the allotment provisions as a method of control, which has been upheld in many cases.[5]

Appellant contends that the portions of the Agricultural Adjustment Act authorizing the Secretary's orders are un-constitutional because they delegate legislative authority to the Secretary of Agriculture, an administrative official. There is no merit to appellant's claim. The Supreme Court has repeatedly held that the Congress may enact a general statute, setting up a definite standard of action, leaving to an administrative official or board the task of prescribing or interdicting particular courses of action within the field covered by the statute. So long as the administrative discretion is confined to effectuating clearly and definitely expressed policies and standards in the act, it does not constitute legislation. The Brig Aurora v. United States, 7 Cranch, 382, 3 L.Ed. 378; Marshall Field & Co. v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294; Buttfield v. Stranahan, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525; United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563; Hampton & Co. v. United States, 276 U.S. 394, 401, 406, 407, 48 S.Ct. 348, 349, 351, 72 L.Ed. 624.

The case is squarely within Hampton & Co. v. United States, supra. There the Supreme Court upheld a tariff act which permitted the President to vary prescribed customs duties in order to 'equalize foreign and domestic costs of production. In the present case the Secretary is authorized to issue orders to effectuate an equality between agricultural prices today and those prevailing during a "base" period described in the statute. Precisely the same sort of standard for administrative judgment is prescribed in one case as in the other. A comparison of the two statutes will show the authority.[6]

Not only is the primary standard thus definitely expressed in the statute, but the orders issued by the Secretary are subject

[5] The Assigned Car Cases, 274 U.S. 564, 47 S.Ct. 727, 71 L.Ed. 1204; Commissioner of Immigration v. Gottlieb, 265 U.S. 310, 44 S.Ct. 528, 68 L.Ed. 1031; Avent v. United States, 266 U.S. 127, 45 S.Ct. 34, 69 L.Ed. 202; Akron, C. & Y. R. Co. v. United States, 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605; Griswold v. The President (C.C.A.) 82 F.(2d) 922.

[6] Tariff Act of 1922, 42 Stat. 858, 942. "Sec. 315 (a). In order to regulate the foreign commerce of the United States and to put into force and effect the policy of the Congress by this Act [chapter] intended, whenever the President, upon investigation of the differences in costs of production of articles wholly or in part the growth or product of the

United States and of like or similar articles wholly or in part the growth or product of competing foreign countries, shall find it thereby shown that the duties fixed in this Act [chapter] do not equalize the said differences in costs of production in the United States and the principal competing country he shall, by such investigation, ascertain said differences and determine and proclaim the changes in classifications or increases or decreases in any rate of duty provided in this Act [chapter] shown by said ascertained differences in such costs of production necessary to equalize the same. Thirty days after the date of such proclamation or proclamations such changes in classification shall take effect, and such increased or decreased duties

to still more precise rquirements. To authorize the orders there must be a hearing of the affected parties, after notice to them, the method of which is carefully detailed in the act. Findings must be based on the hearing, showing that they warrant the orders to conform to a prior contract with 80 per cent. in volume of the shippers. Consent to the order must be given by more than 70 per cent. in volume of the growers. In addition to these, the statute lays down certain alternative provisions, some of which must be included in every order issued.[7]

In support of his contention that the act before us delegates legislative power to the

---

shall be levied, collected, and paid on such articles." (19 U.S.C.A. § 154).

Agricultural Adjustment Act, 48 Stat. 31, as amended (7 U.S.C.A. § 601 et seq.).

Sec. 8c. "(3) Whenever the Secretary of Agriculture has reason to believe that the issuance of an order will tend to effectuate the declared policy of this title [chapter] with respect to any commodity or product thereof specified in subsection (2) of this section, he shall give due notice of and an opportunity for a hearing upon a proposed order.

"(4) After such notice and opportunity for hearing, the Secretary of Agriculture shall issue an order if he finds, and sets forth in such order, upon the evidence introduced at such hearing (in addition to such other findings as may be specifically required by this section) that the issuance of such order and all of the terms and conditions thereof will tend to effectuate the declared policy of this title [chapter]." 7 U.S.C.A. § 608c(3, 4).

"Sec. 2. It is hereby declared to be the policy of Congress—

"(1) Through the exercise of the powers conferred upon the Secretary of Agriculture under this title [chapter], to establish and maintain such balance between the production and consumption of agricultural commodities, and such marketing conditions therefor, as will reestablish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period. The base period in the case of all agricultural commodites except tobacco and potatoes shall be the prewar period, August 1909-July 1914." 7 U.S.C.A. § 602(1).

"Sec. 8e [608e]. Determination of Base Period. In connection with the making of any marketing agreement or the issuance of any order, if the Secretary finds and proclaims that, as to any commodity specified in such marketing agreement or order, the purchasing power during the base period specified for such commodity in section 2 [602] of this title cannot be satisfactorily determined from available statistics of the Department of Agriculture, the base period, for the purposes of such marketing agreement or order, shall be the post-war period, August 1919-July 1929, or all that portion thereof for which the Secretary finds and proclaims that the purchasing power of such commodity can be satisfactorily determined from available statistics of the Department of Agriculture." 7 U.S.C.A. § 60Se.

[7] Section 8c(6), footnote 1, supra.

"(7) Terms common to all orders

"In the case of the agricultural commodities and the products thereof specified in subsection (2) orders shall contain one or more of the following terms and conditions:

"(A) Prohibiting unfair methods of competition and unfair trade practices in the handling thereof.

"(B) Providing that (except for milk and cream to be sold for consumption in fluid form) such commodity or product thereof, or any grade, size, or quality thereof shall be sold by the handlers thereof only at prices filed by such handlers in the manner provided in such order.

"(C) Providing for the selection by the Secretary of Agriculture, or a method for the selection, of an agency or agencies and defining their powers and duties, which shall include only the powers:

"(i) To administer such order in accordance with its terms and provisions;

"(ii) To make rules and regulations to effectuate the terms and provisions of such order;

"(iii) To receive, investigate, and report to the Secretary of Agriculture complaints of violations of such order; and

"(iv) To recommend to the Secretary of Agriculture amendments to such order.

"No person acting as a member of an agency established pursuant to this paragraph (C) shall be deemed to be acting in an official capacity, within the meaning of section 610(g) of this title, unless such person receives compensation for his personal services from funds of the United States.

"(D) Incidental to, and not inconsistent with, the terms and conditions specified in subsections (5), (6), and (7) and necessary to effectuate the other provisions of such order." Section 8c (7), 7 U.S.C.A. § 608c (7).

Secretary of Agriculture, appellant cites Panama Refining Co. v. Ryan, 293 U.S. 388, 415, 416, 55 S.Ct. 241, 246, 79 L.Ed. 446, in which the Supreme Court held that section 9(c) of the National Industrial Recovery Act (15 U.S.C.A. § 709(c), which gave the President the power to prohibit the transportation in interstate commerce of "hot oil," was such an invalid delegation of power. The court said in that case that the act fixed no standards or criteria to govern the exercise of the President's discretion and declared no congressional policy with regard to the transportation of such oil. The

difference between the claimed standards set forth in the National Industrial Recovery Act and those definitely presented in the statute before us is manifest.[8]

For the same reason appellant's citation of Schechter Corporation v. United States, 295 U.S. 495, 538, 55 S.Ct. 837, 846, 19 L.Ed. 1570, 97 A.L.R. 947, is not persuasive. No standards of discretion were given the President other than the National Industrial Recovery Act's general declaration of policy footnote 8, supra) and a few vague additional requirements,[9] the whole lacking utterly the precision of guidance found in

---

[8] National Industrial Recovery Act. 48 Stat. 195.

"Sec. 1. A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources." 15 U.S.C.A. § 701.

Section 9 (c).

"The President is authorized to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State." 15 U.S.C.A. § 709(c).

[9] National Industrial Recovery Act, § 3(a).

"Upon the application to the President by one or more trade or industrial associations or groups, the President may approve a code or codes of fair competi-

tion for the trade or industry or subdivision thereof, represented by the applicant or applicants, if the President finds (1) that such associations or groups impose no inequitable restrictions on admission to membership therein and are truly representative of such trades or industries or subdivisions thereof, and (2) that such code or codes are not designed to promote monopolies or to eliminate or oppress small enterprises and will not operate to discriminate against them, and will tend to effectuate the policy of this title: Provided, That such code or codes shall not permit monopolies or monopolistic practices: Provided further, That where such code or codes affect the services and welfare of persons engaged in other steps of the economic process, nothing in this section shall deprive such persons of the right to be heard prior to approval by the President of such code or codes. The President may, as a condition of his approval of any such code, impose such conditions * * * for the protection of consumers, competitors, employees and others, and in furtherance of the public interest, and may provide such exceptions to and exemptions from the provisions of such code, as the President in his discretion deems necessary to effectuate the policy herein declared." 15 U.S.C.A. § 703(a).

Sec. 3(d). "Upon his own motion, or if complaint is made to the President that abuses inimical to the public interest and contrary to the policy herein declared are prevalent in any trade or industry or subdivision thereof, and if no code of fair competition therefor has theretofore been approved by the President, the President, after such public notice and hearing as he shall specify, may prescribe and approve a code of fair competition for such trade or industry or subdivision thereof, which shall have the same effect as a code of fair competition approved by the President under subsection (a) of this section." 15 U.S.C.A. § 703(d).

the tariff act upheld in the Hampton Case and the provisions of the Agricultural Adjustment Act called in question here.

The appellant also urges that the act is invalid because it delegates legislative authority to groups of private individuals, in that it requires the Secretary's order to be in accordance with a marketing agreement and to be approved by a certain proportion of the commodity affected. (See footnote 1, § 8c(8), p. 771 supra). In support of this position appellant cites Carter v. Carter Coal Co., 298 U.S. 238, 311, 56 S.Ct. 855, 873, 80 L.Ed. 1160. This involved the validity of the Guffey Coal Act, which gave to two-thirds of the producers and a majority of the miners in a given district the power to fix maximum hours and minimum wages for the district. The court held: "This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business."

The marketing agreement is a mere sine qua non of the order, not its source or cause. So also with the growers' assent. The conditions requiring the order must be those prescribed by the statute and so found by the Secretary. The fact, that if the findings, satisfy the statutory requirements for the regulation but the order "shall become effective" only on the making of the marketing agreement and consent of the growers, confers merely the power of negation and not of creation on the shippers and growers.

Appellant specifically complains that the exercise of the power to order the regulation is not commanded by the statute but is in the Secretary's uncontrolled discretion. There is no warrant for this contention. The act reads:

"Sec. 8c [608c]. (3) Whenever the Secretary of Agriculture has reason to believe that the issuance of an order will tend to effectuate the declared policy of this title [chapter] with respect to any commodity or product thereof specified in subsection (2) of this section, he *shall* give due notice of and an opportunity for a hearing upon a proposed order. * * *

"(4) After such notice and opportunity for hearing, the Secretary of Agriculture *shall* issue an order if he finds." (Emphasis supplied.)

Appellant also directs our attention to Eubank v. Richmond, 226 U.S. 137, 141, 143, 33 S.Ct. 76, 57 L.Ed. 156, 42 L.R.A.(N.S.) 1123, Ann.Cas.1914B, 192, which declared invalid a municipal ordinance which provided that whenever two-thirds of the property owners on any street should request the city authorities to establish a building line on the side of the square on which their properties fronted, the authorities should establish such a line. The only restriction prescribed in the ordinance was that the line should not be less than five or more than thirty feet from the street line. This was held void for lack of due process, because it gave power to some property owners to control the property rights of others for any capricious reason which might move them. The arbitrary affirmative power of two-thirds of the owners over one-third bears no resemblance to the mere right of negation in shippers and growers.

Washington ex rel. Seattle Trust Co. v. Roberge, 278 U.S. 116, 122, 49 S.Ct. 50, 52, 73 L.Ed. 210, 86 A.L.R. 654, is a similar decision. There a comprehensive zoning ordinance concededly valid in its general provisions was enacted, covering an area of five acres upon which a home for some fourteen aged poor was maintained. It was proposed to replace the structure with a large building for thirty such occupants. The court found the use of the property not out of accord with the general purposes of the ordinance, and held invalid, as an arbitrary exercise of power over it, a requirement that the owners of two-thirds the property within 400 feet of the building should consent to such use. There an owner has the purposed use of his property arbitrarily taken from him. The case bears no pertinent resemblance to the power of negation to the restriction of citrus shipments in the instant case.

The applicable principle is established in Fallbrook Irrigation District v. Bradley, 164 U.S. 112, 178, 17 S.Ct. 56, 41 L.Ed. 369. That was a decision sustaining the act of California providing for the creation and operation of irrigation districts. The act specified in detail just how such a district might be created and how it would function. It provided that such a district would be created when 50 or more per cent. of landowners whose property was irrigable, in the same manner from a common source, petitioned the county board of supervisors for the creation of such a district and the supervisors had submitted the proposition to the

persons affected within the proposed district and had received a favorable vote. The supervisors were given some independent authority in respect to boundaries.

In answer to the contention that this constituted a invalid delegation, the Supreme Court remarked (164 U.S. 112, at page 178, 17 S.Ct. 56, 70, 41 L.Ed. 369): "We do not think there is any validity to the argument. The legislature delegates no power. It enacts conditions upon the performance of which the corporation shall be regarded as organized with the powers mentioned and described in the act."

We think it clear that there is no delegation of legislative authority to private individuals affected by the provisions of the act which are assailed here. It is the Secretary who makes the decisions and issues the orders, not the growers or handlers whose approval he must have. This conclusion is fortified by the provision of section 8c(9) which authorizes orders to be issued in certain cases even though no marketing agreement has been signed.[10]

We therefore conclude that the act before us contains no delegation of legislative authority, either to the Secretary or to private individuals.

Appellant feebly contends that the decision in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, struck down not only the provisions of the Agricultural Adjustment Act there involved, but voided the entire act, and hence there was nothing to which the subsequent amendments would apply. The separability section of the statute (section 14, 7 U.S.C.A. § 614), and its provision that the unconstitutionality of one set of provisions shall not affect provisions satisfying the Constitution, refute the contention. The taxation method declared invalid is a complete plan of regulation in itself and distinct and separable from the plan of direct control of shipments. Utah Power & Light Co. v. Pfost, 286 U.S. 165, 184, 52 S.Ct. 548, 553, 76 L.Ed. 1038; Opinion of Chief Justice, Carter v. Carter Coal Co., 298 U.S. 238, 320, et seq., 56 S.Ct. 855, 876, 80 L.Ed. 1160; United States v. David Buttrick Co. (C.C.A.1) 91 F.(2d) 66, decided June 16, 1937.

The decree of the District Court enjoining appellant from shipping his citrus fruit in interstate commerce is affirmed.

HANEY, Circuit Judge (concurring).

I concur in the result.

I think it unnecessary to consider the question as to whether National Labor Relations Board v. Jones & Laughlin Steel Corporation, 57 S.Ct. 615, 81 L.Ed. ——, 108 A. L.R. 1352, overruled Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160, though in my opinion the effect of the former decision is substantially to abandon the doctrine of the latter case. The present act is free from the constitutional objections raised in this case.

The Supreme Court said in the National Labor Relations Board v. Jones & Laughlin, supra, for reasons pointed out: "These cases [Carter v. Carter Coal Co., supra, and Schechter Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947] are not controlling here." For stronger reasons we can well say "These

---

[10] "(9) Orders with or without marketing agreement

"Any order issued pursuant to this section shall become effective in the event that, notwithstanding the refusal or failure of handlers (excluding cooperative associations of producers who are not engaged in processing, distributing, or shipping the commodity or product thereof covered by such order) of more than 50 per centum of the volume of the commodity or product thereof (except that as to citrus fruits produced in any area producing what is known as California citrus fruits said per centum shall be 80 per centum) covered by such order which is produced or marketed within the production or marketing area defined in such order to sign a marketing agreement relating to such commodity or product thereof, on which a hearing has been held, the Secretary of Agriculture, with the approval of the President, determines:

"(A) That the refusal or failure to sign a marketing agreement (upon which a hearing has been held) by the handlers (excluding cooperative associations of producers who are not engaged in processing, distributing, or shipping the commodity or product thereof covered by such order) of more than 50 per centum of the volume of the commodity or product thereof (except that as to citrus fruits produced in any area producing what is known as California citrus fruits said per centum shall be 80 per centum) specified therein which is produced or marketed within the production or marketing area specified therein tends to prevent the effectuation of the declared policy of this title with respect to such commodity or product." Section 8c(9), 7 U.S.C.A. § 608c(9)(A).

cases" are not controlling in the instant case.

Amici curiæ raise two questions in addition to those argued by appellant, which we should consider.

*First.* It is argued that the marketing agreement was not authorized by the original act, and therefore the orders are not based on a valid marketing agreement and are void. Section 8(2) of the original act (48 Stat. 34) authorized the Secretary of Agriculture to enter into marketing agreements with "others engaged in the handling, in the current of interstate or foreign commerce of any agricultural commodity." The marketing agreement involved herein was entered into pursuant to that provision.

By the amendment of August 24, 1935, the foregoing provision was re-enacted with some amendments thereto, as secion 8b (7 U.S.C.A. § 608b). I believe, therefore, that the marketing agreement was validly made. The provision in the amended act that the marketing agreement must be entered into pursuant to section 8b is fulfilled, because the agreement was entered into, pursuant to section 8(2) of the original act, which is now section 8b of the amended act.

*Second.* Jurisdiction was given to the District Court "to enforce, and to prevent and restrain any person from violating the provisions \* \* \* of any order, regulation or agreement heretofore or hereafter made," by the Act of May 9, 1934. 48 Stat. 675, as amended by Act Aug. 24, 1935, 49 Stat. 762 (7 U.S.C.A. § 608a). The provisions for orders in relation to citrus fruits was not added to the act until August, 1935. Therefore, argue amici curiæ, jurisdiction was not given with respect to orders and agreements relating to citrus fruits.

The Act of June 19, 1936 (49 Stat. 1539, 7 U.S.C.A. §§ 608a-1, 613a), repealed parts of the Act of May 9, 1934, but expressly provided "but in all other respects such amendatory Act [said sections] [May 9, 1934] shall be and remain in force and effect until December 31, 1937." (7 U.S.C.A. § 613a.) This amounted to a re-enactment sufficient to confer jurisdiction upon the court below regarding the orders in question.

The bill herein was filed March 10, 1936, prior to the act conferring jurisdiction. The answer was filed July 10, 1936. The case was submitted to the court below on the same date upon a stipulation of facts thereafter to be filed. Such stipulation was filed August 20, 1936. Decree was entered Sep-

tember 24, 1936, at a time when the court below had jurisdiction. The fact that the suit was filed before jurisdiction was conferred does not invalidate the decree made after jurisdiction over the subject-matter was conferred by statute.