182 So.2d 429 (1965)
CITY GAS COMPANY, a Florida Corporation, Petitioner,
v.
PEOPLES GAS SYSTEM, INC., a Florida Corporation, Respondent.
No. 33815.
Supreme Court of Florida.
July 14, 1965.
Rehearing Denied December 15, 1965.
*430 Ward & Ward, W.G. Ward, and Dubbin, Schiff, Berkman & Dubbin, Miami, for petitioner.
McClain, Thompson & Turbiville, J.A. McClain, Jr., Tampa, Scott, McCarthy, Preston & Steel and George W. Wright, Jr., Miami, for respondents.
Edgar H. Dunn, Jr., St. Petersburg, and Erskine W. Landis, DeLand, amici curiae.
O'CONNELL, Justice.
This cause is before this Court on petition for writ of certiorari pursuant to the certification by the District Court of Appeal, Third District, that its decision reported as Peoples Gas System, Inc. v. City Gas Company, Fla.App. 1964, 167 So.2d 577, "passes upon a question * * * of great public interest." Article V, Sec. 4(2), Florida Constitution, F.S.A.
In September, 1960, petitioner and respondent, both distributors of natural gas in Dade and Broward Counties, entered into a territorial service agreement. The agreement delineated service areas for each of the parties and provided that neither would extend its operations to the territory of the other. It was provided that each party would purchase the equipment of the other located within its assigned territory and that enforcement of the agreement would be by specific performance. The obvious purpose was to eliminate competition between, and duplication of facilities and service by, the parties within the area covered.
In accordance with the terms of agreement, it was jointly submitted by the parties to the Florida Public Utilities Commission. That agency gave its formal approval, observing that such agreements were in the public interest and should be encouraged. Although acknowledging that it is not authorized to grant franchises or certificates of convenience and necessity to electric and gas companies, the commission asserted that such territorial service agreements would not be valid without its approval because they necessarily limited the commission's statutory authority to require additions and extensions to plant and equipment. Although the validity of such agreements has never been judicially determined, it appears that the commission has previously approved similar ones.
On May 7, 1962, Peoples Gas Company filed a complaint in circuit court alleging *431 that City Gas Company had violated the agreement by taking certain steps, including interim distribution of liquefied gas, toward the establishment of a gas distribution system in an area reserved by the agreement to Peoples. The complaint sought a decree for specific performance, an injunction against continued violation of the agreement, and other appropriate relief.
City Gas filed an answer which in substance (1) denied that the disputed area was covered by the agreement; (2) asserted that Peoples was estopped from bringing such a complaint by reason of its failure to take earlier action, although having adequate notice of the activity complained of; and (3) asserted that in any event the agreement was void and unenforceable under F.S. Chapter 542, F.S.A. and Title 15, U.S.C.A., the latter being the Sherman Antitrust Act. City Gas also filed a counterclaim to enjoin Peoples from interfering further with its efforts to extend its service to the area involved.
On May 23, 1962, the chancellor issued a final decree dismissing the complaint on the ground that the agreement did not cover the disputed area. The City Gas counterclaim was dismissed without prejudice. The decree did not deal with the other issues raised in the answer.
On appeal, the District Court of Appeal, Third District, reversed and remanded, holding that the disputed area did fall within the area reserved to Peoples by the agreement. See Peoples Gas System, Inc. v. City Gas Company, Fla.App. 1962, 147 So.2d 334.
After further proceedings, the chancellor issued the final decree here involved, holding that in the absence of a specific, as opposed to merely implied, statutory provision therefor, the Florida Public Utilities Commission lacked authority to approve such agreements and that they were therefore invalid under the Florida antimonopoly statute, F.S. Ch. 542, F.S.A. City Gas' counterclaim, which had been reinstated, was again dismissed without prejudice. The chancellor observed that this disposition of the case made it unnecessary to decide questions concerning estoppel and the possible invalidity of the agreement under federal law.
On appeal, Peoples Gas listed seventeen assignments of error, the combined import of which was that it was error for the chancellor to hold that in the absence of express statutory provision, the commission lacked authority to immunize, by its approval, the agreement against invalidity under F.S. Ch. 542, F.S.A. City Gas filed a cross-assignment of error charging that the chancellor had erred in refusing to hold specifically that the agreement was also void as being in violation of Title 15, U.S.C.A. and as burdening interstate commerce, although these issues had been clearly framed by the pleadings and the testimony.
In its opinion reported at 167 So.2d 577, the District Court of Appeal, Third District, stated the crucial question to be: "Can the Public Utilities Commission exercise any power not expressly granted?" The court reversed the decree, holding that on the basis of (1) the broad scope of the powers granted to the commission by F.S. Ch. 366, F.S.A., (2) the extent of the public interest in the effective regulation of public utilities, and (3) the express statutory direction that the powers of the commission be liberally construed, the commission did have implied authority to approve such agreements, thereby immunizing them against invalidity under Ch. 542. The district court refused to consider defendant's attempted cross-assignment of error, on the ground that Rule 3.5, Florida Appellate Rules, 31 F.S.A., limits assignments and cross-assignments to judicial acts, as opposed to mere grounds given by the court below for its judicial acts.
The district court and both parties are in agreement that the principal question to be answered is whether the commission possesses authority under the statutes to approve such service area agreements. The petitioner, City Gas, takes the position that *432 the agreement is void under both state and federal antitrust legislation, whether or not approved by the commission. The respondent, Peoples Gas, agrees that the agreement would have been invalid in the absence of commission approval, but argues that this would have resulted from Ch. 366, which authorizes the regulation of distributors of gas and electricity, rather than from the antitrust acts.
We prefer to formulate the questions that need answering as follows: (1) whether the agreement would have been invalid under Ch. 542 in the absence of commission approval; (2) whether the agreement would have been invalid under Ch. 366 in the absence of commission approval; (3) assuming an affirmative answer to either of these questions, whether commission approval would have the effect of immunizing the agreement against such invalidity; and (4) whether the District Court of Appeal, Third District, was correct in its interpretation of Rule 3.5, F.A.R.
On its face the agreement seems to be in violation of Ch. 542. That chapter forbids combinations which have the purpose of imposing "restrictions in the full and free pursuit of any business authorized or permitted by the laws of this state" or of preventing "competition in manufacture, making, transportation, sale or purchase of merchandise, produce or commodities * * *." There is no doubt that in restricting the activities of each of the parties in the areas allocated to the other, the agreement seems to do what is prohibited.
But it is a commonplace that anti-monopoly statutes are not intended for literal application, but, rather, are intended only to prevent undue, or unreasonable, restrictions upon free competition. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1910); Lee v. Clearwater Growers' Ass'n, 93 Fla. 214, 111 So. 722 (1927); McQuaig v. Seaboard Oil Co. et al., 96 Fla. 275, 118 So. 424 (1928); Montana-Dakota Utilities Co. v. Williams Elec. Coop., 263 F.2d 431 (C.A. 8th 1959). Thus, such statutes are not directed against monopoly per se, but rather against the evils that led to their enactment. As Chief Justice White analyzed the history of such legislation in Standard Oil Co. of New Jersey v. United States, supra, 221 U.S. at p. 52, 31 S.Ct. at p. 512, these were: "(1) The power which the monopoly gave to the one who enjoyed it, to fix the price and thereby injure the public; (2) The power which it engendered of enabling a limitation on production; and (3) The danger of deterioration in quality of the monopolized article which it was deemed was the inevitable resultant of the monopolistic control over its production and sale." If, in short, the agreement under consideration has the effect of leaving an unreasonable degree of control over price, production, or quality of product or service in the hands of the parties thereto, it would evidence the kind of monopolistic advantage that Ch. 542 and other statutes of the kind were intended to prevent. If it does not leave such control in the hands of the parties we perceive no conflict between the agreement and the anti-monopoly statute.
That this is the construction to be placed on this state's anti-monopoly legislation seems to be indicated by an earlier decision of this Court. In Lee v. Clearwater Growers' Ass'n., 93 Fla. 214, 111 So. 722, 723-724 (1927), in which the issue was the validity of a co-operative marketing agreement under the federal legislation, the Court said:
"In construing statutes and contracts against monopolies or in restraint of trade both state and federal courts in this country have applied the rule of reason rather than the literal import of the statute, and have said in substance that it must amount to an undue or unreasonable restraint of trade. It must, in other words, be such a restraint as to be detrimental to public welfare and obnoxious to public policy. * * * There is no attempt here to *433 limit production or control or to fix the price in the market of the commodities embraced in the contract, and so far as we have been able to find no contract has been declared void that does not do this."
If, then, the purpose of Ch. 542 be taken as prohibiting only unreasonable restraints on trade and competition, and if "unreasonable restraints" be understood as including only those combinations which permit the control of price, production, or quality of service or product, it would appear that this agreement would be valid so far as Ch. 542 is concerned. This is so because the public welfare does not need Ch. 542 for protection against this kind of agreement. And it does not need it because the public interest is adequately protected by an alternative arrangement under F.S. Ch. 366, F.S.A.
It has long been recognized that although competition is usually a trustworthy protector of the public interest in reasonable prices and quality of goods and services, it is not necessarily the most efficient protective device in all circumstances. In short, in some circumstances, reliance has been placed rather upon the principle of regulated monopoly. The Montana Public Service Commission has expressed this view in strong terms. Public Service Commission of Montana v. Blue Flame Gas Company, 1926D P.U.R. 314, 319:
"* * * [I]t has been conclusively demonstrated in almost every small community where the experiment has been tried, that the grant of franchises to competing public utilities is wrong in principle and invariably results in unsatisfactory service. Competition has long ceased to be potent as a regulatory factor in public utility operations. Where it was relied upon, it proved to be bad in the long run for consumers of utility service, as it too often meant duplication of facilities in a field not large enough to support more than one company. The usual outcome of this was consolidation, followed by recoupment, by means of high rates, of losses due to competition. It has taken a long time for the public to understand that competition as a regulator of charges in the public utility industry is a failure, and even now, the fact is not appreciated by casual observers."
Judge Prettyman, recently writing for the United States Court of Appeals for the District of Columbia in the case of People of State of Calif. v. Federal Power Commission, 111 U.S.App.D.C. 226, 296 F.2d 348, 353-354 (1961), had occasion to discuss the relationship between these two devices for the protection of the public interest:
"We are here dealing with the interweaving of free competition, regulated monopoly, and the public interest. Free competition is a basic postulate of our free enterprise system, but it is not always  in all conditions  in the public interest; sometimes regulated monopoly, or a measure of controlled monopoly, is in the public interest. The policy of the antitrust laws is to foster free competition. The policy of regulatory measures such as the Natural Gas Act is public regulation of controlled monopoly, or partial monopoly. Thus, in the fields of merchandising and manufacturing, the law prohibits interference with competitors or competition and requires full and free play to rivalries in the marketplace. The resultant constrictions upon prices and practices are deemed to be in the public interest. But, in the field of public utilities, monopoly, or partial monopoly, under public regulation is deemed to be in the public interest. Public utilities are treated as public services. The principal requirement is service, and service is not a necessary result of a competition bent on mutual destruction. * * * The antitrust laws and the regulatory laws are not in conflict; they are complementary. Both have as their objective the public interest. *434 They deal with different subject matters. They have been entrusted by the Congress to different enforcement agencies. When the Power Commission considers the policies and provisions of the antitrust laws in respect to the transactions of utilities under its jurisdiction, it is not required to  and indeed should not  begin with a general premise that competition is always and under all circumstances in the public interest. Its premise should be that the antitrust laws in certain areas of our economy and the regulatory laws in other areas are supplementary enactments and each must be given full effect in its area, recognizing always its concomitant body of law in the other area."
We will not go so far as to hold that the regulation of a specified industry as a public utility automatically withdraws that industry from the operation of the antitrust statutes. It is enough to say that the agreement under discussion will not be held to be violative of those statutes unless, all things considered, it threatens the results which they were designed to prevent. In determining whether the agreement threatens to result in monopolistic control over prices, production, or quality of service, it is appropriate to consider the kind and extent of control to which both of these parties are subject under F.S. Ch. 366, F.S.A.
No exhaustive analysis of Ch. 366 is necessary to enable one to conclude that it effectively forecloses the subject agreement having the effect forbidden by Ch. 542. Section 366.03 requires each public utility (i.e., in general, any supplier of gas or electricity to the public) to furnish to all persons applying therefor "reasonably sufficient, adequate and efficient service upon terms as required by the commission." Section 366.04 vests in the commission "jurisdiction to regulate and supervise each public utility with respect to its rates, service and the issuance and sale [of certain] of its securities * * *." In prescribing the powers of the commission under this chapter, section 366.05 authorizes the commission, inter alia,
"to prescribe fair and reasonable rates and charges, classifications, standards of quality and measurements, and service rules and regulations to be observed by each public utility; * * * to require repairs, improvements, additions and extensions to the plant and equipment of any public utility reasonably necessary to promote the convenience and welfare of the public and secure adequate service or facilities for those reasonably entitled thereto; * * * to prescribe all rules and regulations reasonably necessary and appropriate for the administration and enforcement of this chapter; and to exercise all judicial powers, issue all writs and do all things, necessary or convenient to the full and complete exercise of its jurisdiction and the enforcement of its orders and requirements."
Section 366.06(2) relates to the setting of rates. It provides:
"(2) A public utility shall not, directly or indirectly, charge or receive any rate not on file with the commission for the particular class of service involved, and no change shall be made in any schedule. All applications for changes in rates shall be made to the commission in writing under rules and regulations prescribed, and the commission shall have the authority to determine and fix fair, just and reasonable rates that may be requested, demanded, charged or collected by any public utility for its service. The commission shall investigate and determine the actual legitimate costs of the property of each utility company, actually used and useful in the public service, and shall keep a current record of the net investment of each public utility company in such property which value, as determined by the commission, shall *435 be used for rate-making purposes and shall be the money honestly and prudently invested by the public utility company in such property used and useful in serving the public, less accrued depreciation * * *."
Finally, section 366.07 authorizes the commission, upon a finding that rates or charges or rules, practices, and so forth relating to them are "unjust, unreasonable, insufficient, or unjustly discriminatory or preferential, or in any wise in violation of law," to "determine and by order fix the fair and reasonable rates, rentals, charges or classifications, and reasonable rules, regulations, measurements, practices, contracts or service, to be imposed, observed, furnished or followed in the future."
These provisions add up to what can only be considered a very extensive authority over the fortunes and operation of the regulated entities. In any event, it would certainly seem that, in practice, this agreement could result in monopolistic control over price, production, or quality of service only by the sufferance of the commission. Certainly, its statutory powers are more than sufficient to prevent any such outcome if properly employed.
We are aware that it has been reported that a majority of jurisdictions considering this question have held similar agreements violative of antitrust statutes. 70 A.L.R. 2d 1326; Pennsylvania Water & Power Co. v. Consolidated Gas, Electric Light & Power Co., 184 F.2d 552 (4th Cir.1950), cert. denied, 340 U.S. 906, 71 S.Ct. 282, 95 L.Ed. 655 (1950); Montana-Dakota Utilities Co. v. William Elec. Coop., Inc., 263 F.2d 431, 70 A.L.R.2d 1318 (8th Cir.1959). However, we are of the opinion that the cases so holding have emphasized unduly the universal desirability of competition and have not shown sufficient awareness of the implications of the modern development of the regulated monopoly. We believe the more enlightened view to be that set out above.
Some evidence that the point of view accepted herein is not unreasonable can be seen in the fact that the Ohio antitrust statute, Baldwin's Ohio Revised Code and Service, Sec. 4905.48, the operative language of which is otherwise substantially the same as that of the Florida statute, expressly permits two or more utilities, with the consent of the commission, to enter into an agreement "that will enable them to operate their lines or plants in connection with each other." Nor do we believe that this evidence is greatly weakened by the circumstance that the Ohio court has held that without the statutory provision, the Ohio commission would be without authority to approve such an agreement as is involved here. Ohio-Midland Light & Power Co. v. Columbus & Southern Ohio Elec. Co., Ohio Com.Pl., 123 N.E.2d 675 (1954). The significant fact remains that the Ohio experience shows that such agreements are not necessarily incompatible with the scheme of regulation in effect there and in Florida.
In view of our holding that the Service Area Agreement is not invalid under F.S. Ch. 542, F.S.A., it is unnecessary to determine whether commission approval would operate to immunize the agreement from invalidity under the chapter.
Next we inquire whether the Service Area Agreement is valid under the other applicable statute, Ch. 366, and if not, whether it would be immunized from such invalidity by commission approval. Since it is apparent that any invalidity under Ch. 366 would result from the possibility  even the likelihood  that the agreement would interfere, directly or indirectly, with the legitimate exercise of the commission's statutory powers, both questions can be considered simultaneously.
We assume that if the powers of the commission under this chapter included the authority to issue certificates of convenience and necessity, there would be little or no doubt that such an agreement would be considered violative of the statute as in *436 derogation of the commission's statutory authority over service areas. Indeed, the brief of City Gas contains more than a hint that in such circumstance it would agree that the commission had implied authority to immunize such agreements by its approval. In any event, it seems clear that, without commission approval, such an agreement would be incompatible with the possession of the degree of areal control that such a provision would vest in the commission. This being so, it seems logical next to inquire whether the commission's present statutory powers fall sufficiently short of those hypothesized to warrant a different holding as to the effect of the statute upon an unapproved agreement and as to the effect of the commission's approval.
We are inclined to the view that the differences between the two patterns of regulation are more apparent than real, more of degree than of kind. No one who contemplates the extensive powers granted to the commission under Ch. 366 can doubt that it has effective control over areas of service. Certainly, the statute is quite explicit in granting the commission authority to order extensions of service, additions to equipment, and the like. It may be true that the commission lacks authority, under Ch. 366, to order a public utility out of an area being served. However, there would be obvious limitations on its authority to do so even if it possessed authority to issue certificates of convenience and necessity. Moreover, we assume for the present purposes, without so deciding, that the statutory powers now possessed could be exercised in various subtle ways that would assure the same result  for example, under the authority to determine, for rate making purposes, whether certain investments for equipment were prudently made.
In short, we are of the opinion that the commission's existing statutory powers over areas of service, both expressed and implied, are sufficiently broad to constitute an insurmountable obstacle to the validity of a service area agreement between regulated utilities, which has not been approved by the commission. This, of course, is the position taken by the commission itself, in its order approving this very agreement. Said the commission,
"In the exercise of [its] jurisdiction the Commission is specifically authorized to require repairs, improvements, additions and extensions to the plant and equipment of any public utility reasonably necessary to promote the convenience and welfare of the public and secure adequate service or facilities for those reasonably entitled thereto. Obviously, any agreement between two gas utilities which has for its purpose the establishing of service areas between the utilities will, in effect, limit to some extent the Commission's power to require additions and extensions to plant and equipment reasonably necessary to secure adequate service to those reasonably entitled thereto. In our opinion, such a limitation can have no validity without the approval of this Commission."
By substantially the same reasoning, we also conclude that the commission has adequate implied authority under Ch. 366 to validate such agreements as the one before us. Indeed, we agree with the North Carolina court that the practical effect of such approval is to make the approved contract an order of the commission, binding as such upon the parties. Duke Power Co. v. Blue Ridge Elec. Membership Corp., 253 N.C. 596, 117 S.E.2d 812, 817 (1961). Moreover, as did the district court of appeal, we reject the notion of any such distinction between express and implied statutory authority as posited by the chancellor. The powers of this and similar agencies include both those expressly given and those given by clear and necessary implication from the provisions of the statute. State ex rel. *437 Wells v. Western Union Tel. Co., 1928, 96 Fla. 392, 118 So. 478. Neither category is possessed of greater dignity or effect.
The remaining question relates to the district court's application of Rule 3.5 F.A.R. We agree with the interpretation that the rule forbids appellant's including as a cross-assignment of error the chancellor's refusal to rule upon the asserted invalidity of the service area agreement under federal law. At most, this would have been but another ground for the decree entered.
Since this ground of decision has not been adjudicated, it remains available as the basis for further proceedings if petitioner desires to bring them.
For the foregoing reasons the decision of the District Court of Appeal, Third District, is affirmed.
THORNAL, C.J., and THOMAS and CALDWELL, JJ., concur.
ERVIN, J., dissents with opinion.
ERVIN, Justice (dissenting).
I respectfully dissent. Among the several powers prescribed in F.S. Chapter 366, F.S.A., for the Florida Public Service Commission to exercise in regulating gas companies, I do not find that the Commission is given the power to fix by certificate of necessity, franchise or other directive the territory or area in which any of such companies may furnish service to consumers. Since this power is not expressly given, I do not believe it should be implied. Cf., Radio Telephone Communications, Inc., v. Southeastern Tel. Co., Fla., 170 So.2d 577; Coast Cities Coaches, Inc., v. Dade County, Fla., 178 So.2d 703, opinion filed July 7, 1965.
In our free enterprise system governmental officials and agencies should not undertake to regulate competing businesses unless the statutes in the clearest and most unmistakable language provide the regulation is necessary to the public interest. This is particularly true where the regulation interferes with the territorial extent to which businesses may extend their competitive services.