George H. Sheldon Representative 69th District Tallahassee
QUESTIONS:
1. The Public Service Commission cites s. 323.07 and 323.08, F. S., as authority for the promulgation of rules authorizing the establishment of rate organizations. Are those rules promulgated by the Public Service Commission governing rate organizations valid, based on statutory language?
2. Can the Public Service Commission delegate to rate organizations its statutory responsibility for rate setting, and does the procedure allowing the submission of rates by rate organizations constitute a delegation of the commission's responsibility for rate setting?
3. Assuming the delegation of rate setting is valid, can the Public Service Commission require an individual carrier to participate in a rate organization rather than to submit its rate request directly to the commission for approval?
4. Is the practice of price fixing encouraged by the Public Service Commission and engaged in by various motor carriers in Florida violative of Florida Statutes, specifically Ch. 542?
5. If such practice is violative of Florida Statutes, can the Public Service Commission, by rule, grant an exception to antitrust prosecution?
6. Assuming that the delegation of rate setting is valid, can those rate organizations operate without complying with the provisions of Florida's Public Records and Sunshine Laws?
SUMMARY:
In summary response to the questions posed, I conclude that:
 As to question 1: To the extent that the rules of the Public Service Commission do not mandate a uniform rate, they can be interpreted to be valid.
 As to question 2: So long as the commission retains and exercises final decision making authority with regard to motor carrier rates, there exists no unconstitutional delegation of power to private parties.
 As to question 3: Rules of the commission should be interpreted in a manner that assures each carrier the right to submit to the commission individual rates. Your question must, therefore, be answered in the negative.
 As to questions 4 and 5: An agreement among motor carriers to submit identical rates to the commission constitutes a per se
violation of Ch. 542, F. S., and the scheme of regulation established pursuant to Ch. 323, F. S., does not immunize such conduct from application of the state antitrust law.
 As to question 6: Both the Public Records Law, Ch. 119, F. S., and the Sunshine Law, Ch. 286, F. S., apply to all activities of rate bureaus.
AS TO QUESTION 1:
You request my opinion as to the validity of certain rules adopted by the Florida Public Service Commission (PSC or commission) which authorize the establishment and regulation of motor carrier rate organizations. Analysis is posited on the rule that an administrative agency may only adopt rules within the ambit of the authority granted it by statute. My review is, therefore, first directed to whether the Legislature has authorized the commission to promulgate rate filing rules and second, to whether the commission, in promulgating its rules, has stayed within the regulatory boundaries prescribed by the Legislature.
By statute, the commission is granted the authority to regulate motor carriers and generally to promulgate rules (s. 323.07, F. S.).
More specific statutory language, critical to determination of the validity of the commission's rules pertaining to motor carrier rate organizations, is found at s. 323.08, F. S., which provides in pertinent part:
 (1) Every motor carrier holding a certificate of public convenience and necessity for common carriage shall maintain
on file with the commission a schedule of the rates, fares, charges and classifications, if any, and a time schedule, if any, of all motor vehicles operated under such certificate. . . .
 (2) Whenever such rates or fares or time schedules are found to be unreasonable, the commission, upon its own motion, or upon complaint, shall upon hearing prescribe reasonable rates
and time schedules to take the place of those found unreasonable, and such new rates shall be filed in place of the rates and schedules superseded. No rates or time schedules filed with the commission shall be charged by any such motor carrier except as provided by rules and regulations adopted under this section by the commission. The commission may adopt rules and regulations governing the filing of tariffs and rate schedules and the method whereby changes in such tariffs and rate schedules may be made effective. In the adoption of such rules and regulations the commission is authorized to give consideration to the desirability of having tariff filing rules similar to those of the Interstate Commerce Commission. . . . (Emphasis supplied.)
The commission's authority to promulgate rate filing rules is clear.
The PSC has promulgated rules authorizing the operation of rate organizations. A rate organization is defined in Rule 25-5.130(5), F.A.C., as any organization (association, bureau, conference, committee) approved by the commission to submit tariffs for its members. The organization may be established upon application to and approval by the commission (Rule 25-5.130). Rule 25-5.133, F.A.C., sets out criteria for approval. Of particular significance is the requirement in Rule 25-5.133(2)(e) that the bylaws of an approved organization guarantee all member carriers `the free and unrestrained right to take independent action either before, during or after the procedure' (to establish the tariff filing to be submitted to the commission).
In apparent contradiction is Rule 25-5.132, F.A.C., which identifies two types of carriers that may file tariffs: An approved rate organization or a carrier which is not a member of a rate organization. No provision is made for independent or individual rate filings by those carriers which are members of rate organizations. In addition, Rule 25-5.134, F.A.C., appears to prohibit carriers outside the approved rate organizations from filing general rate increases. The `general rate increase' is defined at Rule 25-5.130(3), F.A.C., as a `proposal to change substantially all or part of the tariff provisions' applicable to a type of carrier. In view of this prohibitory language, the filing of general rate increases appears to be exclusively within the province of approved rate organizations.
Resolution of this apparent contradiction is crucial to the validity of the commission's rules. A determination that the rules represent a valid exercise of rulemaking power requires a finding that the regulatory scheme established by the rules does not exceed the scope of regulation statutorily envisioned by the Legislature. If the commission's interpretation of its rules fails to guarantee to individual members of a rate organization the free and unrestrained right to submit individual tariff filings, the commission has, in effect, commanded a single uniform filing by a majority of the members of an industry.
If, in implementation of its regulatory authority, the commission evidences a clear preference for single filings, this preference would discourage price competition among rate organization members and would be tantamount to setting up a uniform rate structure.
Although the Legislature has clearly given the PSC rulemaking authority, it has not granted to PSC the authority to establish, by rule, a uniform rate system for the motor carrier industry. As discussed in answer to question 4 and 5, infra, the degree of regulation set up in the rate approval scheme does not extend to the elimination of all price competition in the motor carrier industry. The Florida Legislature has not indicated any intention to regulate motor carriers so as to eliminate all price competition among the members of the industry. Any rules promulgated or relied upon by the PSC which result in uniform rate structure would be invalid as beyond the scope of regulation envisioned by the Legislature.
By comparison, the Florida Supreme Court has considered a question touching on uniform rate filings by freight forwarders regulated by the PSC under ss. 323.51-323.67, F. S. See Florida Freight Forwarders v. Bevis, 277 So.2d 529 (Fla. 1973). In Florida FreightForwarders, the issue was whether the PSC had substantial evidence to support its refusal by Order No. 10032 to allow a rate differential between freight forwarders which provided pickup services for goods and commodities collected and those forwarders which did not provide such service. Although the validity of PSC Order No. 10228 requiring freight forwarders to file uniform rates was not raised, that order was affirmed by the court at 529. However, the arguments for the validity of PSC orders of uniform rates for freight forwarders may be stronger than those favoring uniformity for motor carriers. First, the degree of regulation of the freight forwarders and the extent of the commission's rulemaking authority were more extensive and more explicit. Contrast s. 323.53 and ss. 323.55-323.57 with s. 323.07 and s. 323.08, F. S. Second, the PSC had determined by hearing that uniform rate filings by freight forwarders were desirable (Respondent's Brief in Opposition to the Petition for Writ of Certiorari, p. 2.). By comparison, the more limited statutory regulation of motor carriers and the less generous grant of specific rulemaking authority in s. 323.08 would support a finding that the PSC does not have the authority to require uniform rate filings by the motor carriers.
I do not reach a conclusion of invalidity in this instance however. The ambiguity between the apparent, albeit indirect, guarantee of individual filings by rate organization members in Rule 25-5.133(2)(e), F.A.C., and the sources of tariff filings in Rule 25-5.132, F.A.C., need not be construed to preclude individual filings. The wording of Rule 25-5.132 allows reference to Rule 25-5.133(2)(e):
 . . . Subject to all of the provisions of Part VII, Rule Chapter 25-5, tariffs may be filed with the Commission by either an approved rate organization for its member carriers, or a carrier which does not participate in a rate organization. (Emphasis supplied.)
A finding that Rule 25-5.133(2)(e) governs, i.e., that any member of a rate organization may file independently of the organization, would preserve the validity of the rules. The PSC would not be establishing a uniform rate system and this would not exceed the statutory scheme of regulation.
The tension between Rule 25-5.132, F.A.C., and Rule25-5.133(2)(e), F.A.C., is more appropriately characterized as an ambiguity rather than a clear inconsistency with the statute itself. In cases of ambiguity, courts will presume the validity of administrative rules and interpret the rules so as to give effect to that presumption. Cf., Sumlin v. Brown, 420 F. Supp. 78, 81-82
(N.D.Fla. 1976). Following this standard of rules construction, I therefore conclude that the commission's rules establishing rate bureaus are valid to the extent those rules do not limit the unrestrained right of motor carriers to submit individual tariff filings.
The following point should be carefully distinguished. A conclusion that rules which establish rate bureaus without mandating uniform rates may be a valid exercise of statutory authority is not equivalent to a conclusion that the carriers which participate in the organizations are immune from prosecution under the state antitrust laws, Ch. 542, F. S. Both conclusion look to the scope of legislative regulation. While the result may seem anomalous, analyses of the commission's rulemaking authority and the immunity of third parties to another Florida Statute are distinct.
AS TO QUESTION 2:
Your second question may be answered by determining whether a delegation has occurred when private parties submit rates for the ultimate approval of an administrative agency. Applicable case law clearly establishes that there is no delegation of authority to private persons under these circumstances so long as the administrative agency makes the final determination. See State v. State Road Department, 173 So.2d 693 (Fla. 1965).
The fact that an agency grants approval of rates submitted by private parties does not mean that the agency has delegated its ratemaking function. Perhaps the leading case on point is Edwards v. United States, 91 F.2d 767 (9th Cir. 1937). In Edwards, a private party challenged the constitutionality of the Agriculture Adjustment Act, 7 U.S.C.A. s. 601. One theory advanced by the plaintiff was that the act permitted private parties to exercise legislative power based on the requirement that the Secretary of Agriculture's orders be consistent with a marketing agreement established by private parties. The court in rejecting this argument stated at 789:
 We think it clear that there is no delegation of legislative authority to private individuals affected by the provisions of the act which are assailed here. It is the Secretary who makes the decisions and issues the orders, not the growers or handlers whose approval he must have.
In the context of your question, application of the quoted language from Edwards supports a determination that no delegation of authority, in the constitutional sense, has occurred merely because private parties initially submit rate proposals. The crucial factor in reaching this conclusion is the administrative agency's retention and exercise of ultimate authority to determine rates. Also see In re Landquist, 70 F.2d 929, 933 (7th Cir. 1937); Dotty v. Love, 295 U.S. 4 (1935); Currin v. Wallace, 306 U.S. 1
(1937); Herrin v. Arnold, 82 P.2d 977 (Okla. 1938); Kaplan v. Dee,77 So.2d 768 (Fla. 1955); and Miller v. Ryan, 54 So.2d 60 (Fla. 1951). Cf. State v. Allstate Insurance Co., 97 So.2d 372 (Miss. 1957).
Sections 323.07 and 323.08(2), F. S., authorize the Public Service Commission to set or approve rates at a public hearing. Moreover, various rules promulgated by the Public Service Commission make it clear that the commission has the affirmative duty to determine that all rates approved or promulgated by it are reasonable. Rule25-5.131, F.A.C., provides that general rate increases `shall be initiated by written petition to the Commission' and that certain minimum filing requirements, as prescribed in Rule 25-5.140, F.A.C., must be met. It is clear that the Public Service Commission is required by its own rules and by statute to thoroughly investigate any proposed general rate increase. See
State v. Florida East Coast Ry. Co., 59 So. 385 (Fla. 1912) (commission has a duty to inquire into and investigate all rates).
AS TO QUESTION 3:
Rule 25-5.132, F.A.C., unequivocally guarantees the right of carriers not members of rate bureaus to file tariffs directly with the commission:
 Subject to all of the provisions of Part VII, Rule Chapter 25-5, tariffs may be filed with the Commission by either
(1) An approved rate organization for its member carriers, or
 (2) A carrier which does not participate in a rate organization . . . . (Emphasis supplied.)
The procedure by which nonparticipating carriers may submit tariff filings other than general rate increases is specified in Rule25-5.134, F.A.C.
In response to question 1, I concluded that, to give validity to the rules, Rule 25-5.132(1), F.A.C., was to be harmonized with25-5.133(2)(e), F.A.C., in order to guarantee member carriers individual filing access to the commission as well. Any rule which precludes individual submission and thus requires a uniform submission would be invalid since it would be inconsistent with the regulatory scheme of Ch. 323, F. S.
AS TO QUESTIONS 4 AND 5:
Your fourth and fifth question relate to the application of the state's antitrust statute, Ch. 542, F. S., to the activities of the carriers. It is proper to discuss questions four and five together since both questions turn on the scope of regulation found in Ch. 323, F. S. It is fair to say that if the Legislature intended Ch. 542 to apply to motor carriers, it did not intend to authorize the PSC to immunize activities that would otherwise be illegal. This conclusion follows from the principle that the commission only has that authority which is expressly or implicitly conferred by the Legislature. City of Cape Coral v. GAC Utilities, Inc. of Florida, 281 So.2d 493 (Fla. 1973).
Chapter 542 of the Florida Statutes prohibits combinations between competitors if the combination is an unreasonable restraint of trade. Section 542.05, F. S., specifically prohibits combination to keep `transportation at a fixed or graduated figure' or agreements to set the price of transportation services:
542.05 Combinations prohibited; penalty. —
 (1) Any person who shall or may become engaged in any combination of capital, skill or acts by two or more persons, firms, corporations or associations of persons or of either two or more of them, for either, any or all of the following purposes:
 (c) To prevent competition in the manufacture, making, transportation, sale, or purchase of merchandise, produce, or commodities, or to prevent competition in aids to commerce;
 (e) Except as otherwise provided in chapter 541, to make or enter into or execute or carry out any contract, obligation, or agreement of any kind or description by which they shall bind or have bound themselves not to sell, dispose of, or transport any article or commodity, or article of trade, use, merchandise, commerce, or consumption below a common standard figure, or by which they shall agree in any manner to keep the price of such article, commodity, or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of any article or commodity or transportation between themselves and others to preclude a free and unrestricted competition among themselves and others in the sale or transportation of any such article or commodity or by which they shall agree to pool, combine, or unite any interest they may have in connection with the sale or transportation of any such article or commodity that its price may in any manner be affected. (Emphasis supplied.)
Chapter 541, the so-called `Fair Trade Law,' allowed vertical
price fixing under some circumstances. It was repealed by s. 1, Ch. 75-15, Laws of Florida, effective October 1, 1975. In any case, it would have no application to horizontal price-fixing agreements, i.e., agreements among competitors.
The agreement under scrutiny is an agreement between members of a rate organization to submit a single joint tariff for approval,i.e., an agreement not to exercise the right as guaranteed by the bylaws to submit an independent rate. So long as individual access to the PSC is guaranteed, the membership agreement among participating carriers would be of no concern unless shown to unavoidably and necessarily result in uniformity of rates.
Absent state regulation, it is clear that the agreement described above would be per se illegal. Combinations between competitors to set the same or a minimum price have long been held to violate the federal antitrust laws. United States v. Trans-Missouri Freight Association, 166 U.S. 290 (1897); United States v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940). It is clear that an agreement among motor carriers to submit only one rate or to use one rate as minimum would be a price fix between competitors and would violate the Sherman Act, 15 U.S.C. § 1. By the same token, such an agreement to fix or control prices would violate Ch. 542, F. S. City Gas, infra; Hardrives v. East Coast Asphalt Corp.,166 So.2d 810 (2 D.C.A. Fla., 1964); Ricou v. Crossland, 88 So. 381 (Fla. 1926).
It is fair to say that the state courts have followed federal precedent controlling at the time of the state decisions. See Lee v. Clearwater Grower's Association, 111 So. 722 (Fla. 1927);compare Marin Co. Bd. of Realtors, Inc. v. Palsson, 549 P.2d 833,835 (Cal. 1976) (interpreting the California statute on which Ch. 542 was apparently modeled as following federal precedent). Of particular note is Pensacola Associates v. Biggs Sporting Goods Co., 353 So.2d 944 (1 D.C.A Fla., 1978), wherein the First District Court of Appeal, in applying a rule of reason test to a restrictive covenant, relied on federal precedent in conducting its analysis.
The application of Ch. 542, F. S., takes on an entirely new perspective, however, because of the state's regulation of motor carriers under Ch. 323, F. S.
The Florida Supreme Court has utilized a single-step analysis, considering the pervasiveness of the regulatory scheme as the key to whether the agreement violated Ch. 542, F. S. City Gas Co. v. Peoples Gas System, Inc., 182 So.2d 429 (Fla. 1965).
In City Gas, two private utility companies, regulated by the PSC pursuant to Ch. 366, F. S., agreed to allocate territories. Subsequently, the commission approved the agreement, basing its authority on the fact that it had the statutory duty to approve capital construction of facilities and that the agreement to divide service territories avoided duplication of facilities. One party to the agreement breached its terms and the other sought enforcement of the agreement. The breaching party asserted that the agreement was invalid because it violated Ch. 542, F. S.
The court reasoned that not all agreements restraining trade violated Ch. 542, F. S. Instead, only those agreements that have the
 effect of leaving an unreasonable degree of control over price, production or quality of product or service in the hands of private parties thereto and would evidence the kind of monopolistic advantage that Ch. 542 and other statutes of [its] kind were intended to prevent [182 So.2d at 432.]
would be violative of Ch. 542.
Applying this reasoning to the question posed, the dispositive consideration is whether the public is sufficiently protected by the PSC to remove the activity in question from the reach of the state antitrust law. Under the facts in City Gas, the court concluded that the agreement in question did not grant private parties the power to control prices or diminish the quality of service. The court reached its conclusion because of the extensive regulatory power of the PSC under Ch. 366, F. S.
However, the court specifically stated that government regulation of an industry such as a public utility does not completely withdraw the industry from the reach of antitrust laws. Instead, the City Gas court seemingly adopted a case-by-case approach, requiring analysis of the conduct in question and the degree of statutory control over the industry:
 We will not go so far as to hold that the regulation of a specified industry as a public utility automatically withdraws that industry from the operation of the antitrust statutes. It is enough to say that the agreement under discussion will not be held to be violative of those statutes unless, all things considered, it threatens the results which they were designed to prevent. In determining whether the agreement threatens to result in monopolistic control over prices, production, or quality of service, it is appropriate to consider the kind and extent of control to which both of these parties are subject under F. S. Ch. 366, F.S.A. [182 So.2d, at 434.]
City Gas suggests that if private parties have the power to control price, then Ch. 542, F. S., would apply. The question turns, therefore, on whether the Public Service Commission's power to set rates or approve rates provides complete protection for the public so that it would be improper to apply Ch. 542.
It may be argued with considerable force that the authority of the Public Service Commission to set or approve rates provides adequate protection to the public. Agreement among carriers not to exercise their right to submit independent tariffs would therefore not harm the public. Yet, neither City Gas nor any other Florida authority definitively resolves this question.
Section 323.07, F. S., authorizing commission approval of rates, serves a dual purpose of protecting the public from unreasonable rates and in aiding carriers to secure a reasonable return on their investment. Neither purpose necessitates a uniform rate. Both could be accomplished within the statutory scheme by commission approval of rates individually submitted. If administrative efficiency required a less tedious approach, the commission could approve maximum and minimum rates within a zone of reasonableness. The general policies of Ch. 323, F. S., as interpreted by Florida courts, do not require, and thus cannot be said to contemplate, a single uniform rate.
It appears, moreover, that the City Gas court was greatly influenced by the fact that the commission's approval of the agreement was intended to `eliminate competition between andduplication of facilities and services by the parties within thearea covered.' [182 So.2d at 430; emphasis supplied.]. In other words, application of Ch. 542, F. S., in the context of City Gas
would have been repugnant to the statutory scheme. This follows since a contrary result would have interfered with the commission's authority to control capital construction and avoid wasteful duplication of facilities.
In contrast to City Gas, wherein approval of the agreement in question was consistent with the commission's statutory duties, it seems that the form of agreement which is the subject of this discussion cannot readily be reconciled with the legislative policy of Ch. 323, F. S. That chapter does not mandate submission of uniform rates.
Florida courts have consistently emphasized that s. 323.03, F. S., is designed to avoid congestion of the public highways and to generally insulate motor carriers from `ruinous competition.' See
Central Truck Co. v. Railroad Commission of Florida, 1 So.2d 470
(Fla. 1941). Yet, it is not intended that the motor carriers be entirely insulated from competition. Florida Motor Lines v. State Railroad Commission, 132 So. 851, 861 (Fla. 1931). Legislative awareness of the need to prevent ruinous competition is manifested in the provision for certificates of public convenience and necessity required by Ch. 323, F. S., which establishes substantial market entry barriers and results in insulation of motor carriers from the most extreme forms of competition.
In State ex rel. McKenzie v. Willis, 310 So.2d 1 (Fla. 1975), citing City Gas, the court suggested that an agreement to divide territories would have to be approved by the commission. Note also that s. 350.55, F. S., requires the commission to approve any agreement regarding common carrier rates. Motor carriers are not included in the definition of common carriers under s. 350.11(1), F. S.
Since no Florida case is directly controlling, it is appropriate to review the case law of other jurisdictions. The approach taken under federal law is to determine whether the agreement violates Ch. 542, F. S., and then to determine whether the commission's regulatory power can be exercised to provide a defense for the parties to the agreement.
Federal decisions have long recognized that despite the presence of regulation of price, antitrust laws apply unless there is a specific statutory exemption or the application of the antitrust laws would be repugnant to the scheme of regulation. United States v. Trans-Missouri Freight Ass'n., 166 U.S. 296 (1897). This principle was again affirmed in United States v. Joint-Traffic Association, 171 U.S. 505 (1898), and reiterated in State of Georgia v. Pennsylvania Railroad Co., 324 U.S. 439, (1945). In the later case, the State of Georgia alleged that numerous railroads combined to form rate bureaus that illegally established discriminatory rates violative of the Sherman Act. The defendants, members of rate organizations, asserted that the Interstate Commerce Commission had primary jurisdiction and, in any case, that the rate bureaus were sanctioned by the commission. The Supreme Court affirmed the principle that the antitrust laws generally apply to regulated industries except to the extent that their application would be repugnant to the scheme of regulation.
 Only a clear repugnancy between the old law and the new results in the former giving way and then only pro tanto to the extent of the repugnancy. United States v. Borden Co., Supra, 308 U.S., at pages 198, 199, 60 S.Ct. at pages 188, 189, 84 L.Ed. 181. [324 U.S. at 456, 457.]
In the Pennsylvania Railroad case, the United States Supreme Court reasoned that the regulatory power of the Interstate Commerce Commission to fix or approve rates was the power to establish a zone of reasonableness. The public was entitled to price competition between carriers within the zone of reasonableness. Price competition within the zone was deemed in no way repugnant to the ICC's power to fix and approve rates. The antitrust laws therefore applied and the conduct of the members of the rate organizations was condemned.
In 1948, in response to Georgia v. Pennsylvania Railroad Company, Congress amended the Interstate Commerce Act to, in some instances, specifically recognize rate bureaus and, where recognized, provide relief from antitrust laws. See 49 U.S.C.A. s. 5b(2), (9). The controlling fact, for purposes of this review, is that express legislation was necessary to create an exemption to federal antitrust laws because the courts had found no repugnancy between price competition and the ICC's regulatory powers. See State v. New York Movers Tariff Bureau, Inc., 264 N.Y.S.2d 931 (N.Y.S.Ct. 1965) (operation of rate bureaus does not violate state antitrust statute since the state specifically enacted an exemption tracking the federal exemption of motor carriers). By analogy, express legislation of the Florida Legislature would be necessary to create an exemption to the Florida Antitrust Law.
In assessing, at the federal level, the balancing of the antitrust laws and a regulatory scheme, the courts have concluded that general rate regulation does not preclude the application of the antitrust laws. The reasoning would be applicable at the state level as well; other states have followed this general rule. See
Southwest Utilities, Inc. v. South Central Bell Telephone Co., CCH Trade Reg. Rep. (1977-1 Trade Cases) Para. 61, 303 at 70,988, 70,992 (La.Ct.App. 1976) (rates which are just and reasonable may still form part of an overall scheme violative of the antitrust laws), and Mazzola v. The Southern New England Telephone Co., CCH Trade Reg. Rep. (1976 Trade Cases) Para. 60,439 at 66,926 (Conn. 1975) (commission has no implied power to determine defendant's liability since there is only a repeal of the state antitrust law in cases of plain repugnancy). The Mazzola court characterized the state regulation defense as the `state action defense.' This terminology is confusing since the state action defense normally refers to the concept that the federal antitrust laws were not intended to negate comprehensive state regulation.See Cantor v. Detroit Edison Company, 428 U.S. 579, 600 (1976). It would seem that different policies are at play when the issue is whether the federal antitrust laws were intended to displace state regulation because of the Supremacy Clause. There is a serious question as to whether the scheme of regulation detailed in Ch. 323, F. S., would provide a defense to a case brought under the federal antitrust laws. See Opinion of the Attorney General of Arkansas, CCH Trade Reg. Rep. (1976-1 Trade Cases) Paragraph 60584 at page 68,750. Cf. Opinion of North Dakota Attorney General, 5 CCH Trade Reg. Rep. (1976) Paragraph 60,586 at 68,753 (March 5, 1976) (private rate bureaus do not violate a state antitrust statute because of a specific statutory mandate of rate uniformity).
This conclusion is not at all dissimilar to that reached by the Florida Supreme Court in City Gas, although the Florida Court framed its analysis differently. In all cases, the central question is whether the Legislature exempted the industry from the antitrust statute. Under similar circumstances the federal courts have held that the exemption must be express, as Congress provided in 1948 in response to Georgia v. Pennsylvania Railroad. See
49 U.S.C.A. s. 5b(2), (9). This was true since the application of the antitrust law was not repugnant to the scheme of regulation of the Interstate Commerce Commission.
I find no express legislative authority to exempt the motor carriers from the antitrust laws. Furthermore, I am unable to find the requisite intent from other legislative circumstances. Under such circumstances, one must give clear expression of an intent to supplant Ch. 542, F. S., since the general rule is that the PSC only has those powers that are expressly or impliedly conferred upon it. Recently, in State of Florida, Department of Transportation v. Mayo, — So.2d — (Fla. Slip Opinion, Case No. 50,484, Filed Nov. 30, 1977), the court applied a strict rule of construction to the existence of implied power in the Public Service Commission at p. 2:
 Our analysis begins with the recognition that the Public Service Commission was created and exists through legislative enactment. Being a statutory creature, its powers and duties are only those conferred expressly or impliedly by statute. City of West Palm Beach v. Florida Public Service Commission, 224 So.2d 322 (Fla. 1969). Southern Gulf Utilities, Inc. v. Mason, 166 So.2d 138 (Fla. 1964). And any reasonable doubt as to the existence of a particular power of the Commission must be resolved against it. City of Cape Coral v. GAC Utilities, Inc. of Florida, 281 So.2d 493 (Fla. 1973). (Emphasis supplied.)
An implied power to adopt rules that would immunize carriers from the very specific provisions of Ch. 542 must meet the demanding standards that the Supreme Court has established in State ofFlorida, Department of Transportation v. Mayo.
It is true that s. 323.08(2), F. S., provides that in the adoption of rules the commission is authorized to give consideration to the desirability of having tariff filing rules similar to those of the Interstate Commerce Commission. The apparent purpose of s. 323.08(2), F. S., is to foster procedural uniformity and consistency with federal regulation. Questions dealing with the general policy regarding competition are clearly outside the scope of this procedural language. If the language is more than procedural, i.e., if the Legislature has delegated to the PSC a choice on whether or not to permit price fixing among competitors, the delegation raises severe constitutional questions. Harrington Co., Inc. v. Tampa Port Authority, — So.2d — (Fla. Slip Opinion, Case No. 50,111, filed January 17, 1978). In any case, it is the Reed-Bulwinkle Act, 49 U.S.C.A. s. 5b(2), (9), not the ICC rules, which, under the federal scheme, immunizes the carrier. The fact that the Florida Legislature may allow the PSC to consider the desirability of having tariff filing rules similar to those of the ICC does not, standing alone, indicate that the PSC has the authority to immunize carriers from the application of the antitrust laws.
Second, it can be argued that the Legislature approves the existence and practices of rate organizations because it passed a comprehensive revision of the entire motor carrier law in Ch.77-434, Laws of Florida, with knowledge of the organization's activities. Legislative acquiescence, however, is not sufficient to create an exemption to another statute. Legislative concern with competition in the transportation of goods is explicitly stated at s. 542.05, F. S. Acquiescence to an administrative interpretation is not sufficient to create an exemption, which in effect repeals s. 542.05 (the specific application of Ch. 542 to the transportation industry).
The approach suggested by the City Gas court raises serious questions concerning the activities of carriers and the manner in which they submit rates to the commission. I conclude that the language found at s. 323.08(2), F. S., authorizing the PSC to consider the advisability of having tariff filing rules consistent with those of the Interstate Commerce Commission is not a specific adoption of the Reed-Bulwinkle Act; rather, it is intended only to facilitate procedural uniformity. Cf. s. 501.204(2), F. S. Therefore, in light of the foregoing analysis, the Public Service Commission should reassess its procedures concerning rate bureaus. Additionally, I urge the Legislature to address this question and more generally the appropriateness of rate uniformity among motor carriers.
AS TO QUESTION 6:
In Occidental Chemical Co. v. Mayo, 351 So.2d 336 (Fla. 1977), the Florida Supreme Court held that the Public Service Commission is not exempted from operation of s. 286.011, F. S. See also AGO 073-344.
The Supreme Court has stated that the Sunshine Law must be broadly interpreted to avoid frustration of the underlying public policy through `evasive techniques.' City of Miami Beach v. Berns,245 So.2d 38, 41 (Fla. 1971). For example, the court will not tolerate evasion of the statute by `an informal conference or caucus of any two or more members [which] permits crystallization of secret decisions to a point just short of ceremonial acceptance.' Supra
at 41. It has since been held that application of the law does not necessarily require the presence of two or more members of the agency. In Town of Palm Beach v. Gradison, 296 So.2d 473 (Fla. 1974), a citizens' planning committee composed of private citizens and established by the town council which appointed its members was found to be subject to the Sunshine Law. The committee existed to oversee a planning firm retained by the town council in development of a new zoning plan for the town. Numerous private discussions between the committee and the planners took place. The plan was presented to the council which, after full public meetings and hearings, approved the plan substantially as presented by the committee and planners. The court held that the committee was an `alter ego' of the town council and, therefore, had no more right to meet privately with the planners than would the council members themselves. The court reasoned that:
 One purpose of the government in the Sunshine Law was to prevent at nonpublic meetings the crystallization of secret decisions to a point just short of ceremonial acceptance. Rarely could there be any purpose to a nonpublic premeeting conference except to conduct some part of the decisional process behind closed doors. The statute should be construed so as to frustrate all evasive devices. This can be accomplished only by embracing the collective inquiry and discussion stages within the terms of the statute, as long as such inquiry and discussion is conducted by any committee or other authority appointed and established by a governmental agency, and relates to any matter on which foreseeable action will be taken. [296 So.2d at 477; emphasis supplied.]
An agency subject to the Sunshine Law may not, therefore, avoid the requirements of the statute by delegating its own statutory to another entity though its action might be inadvertent and in good faith. In Warden v. Bennett, 333 So.2d 97 (2 D.C.A. Fla., 1976),cert. den. — So.2d — (Fla. 1977), however, the district court distinguished Town of Palm Beach by finding that an administrator who simply carried out agency policies formulated in the sunshine was not subject to the Sunshine Law. The court found the same to be true of a factfinding council which simply reported to the administrator. The distinguishing characteristic for purposes of Sunshine Law analysis is whether the individual or body in question actually formulates or assists in the formulation of official policy and governmental decisions or acts solely in an administrative capacity. See and compare State ex rel. Reno v. Watkins, et al., 11th Judicial Circuit, Case No. 78-3020, wherein an advisory board, closely related to the decisionmaking process and appointed by the single individual charged with making the final, binding appointment of a new police chief, was held subject to the Sunshine Law.
Applying these rules to the instant situation, I find the rate bureaus to be an integral link in the deliberative process from which official policy ultimately evolves. Section 323.08, F. S., provides that no rates shall be fixed or changed except in accordance with the rules and regulations of the commission. The authority delegated to rate bureaus pursuant to these rules appears to be quite broad. The commission may, of course, deny approval of a rate structure submitted by a rate bureau. However, the rules provide the mechanism for submitting rate proposals to the secretary of the organization's rate committee, for notice of hearing to all member carriers and others subscribing to the organization's publication, and for a hearing at which interested parties may be heard. Clearly, rate organizations are conducting activities which are part of the deliberative process and which, if done by the commission, would be subject to the Sunshine Law. This process opens the possibility of quick acceptance by the commission itself, albeit in a public meeting, without the benefit of public deliberation. Hence, even though there has been no delegation of authority in the constitutional sense, there still has been official action within the meaning of Ch. 286, F. S.
In response to your inquiry regarding the applicability to rate bureau operations of Florida's Public Records Law, s. 119.01, F. S., announces as the general state policy on public records that `all state, county, and municipal records shall at all times be open for a personal inspection by any person.' Section 119.011, F. S., defines `public records' and `agency' for the purposes of that chapter to mean:
 (1) `Public Records' means all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings, or other material, regardless of physical form or characteristics, made or received pursuant to law or ordinance or in connection with the transaction of official business by an agency.
 (2) `Agency' shall mean any state, county, district, authority, or municipal officer, department, division, board, bureau, commission or other separate unit of government created or established by law and any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency. (Emphasis supplied.)
Section 119.07(1), F. S., requires:
 Every person who has custody of public records shall permit the records to be inspected and examined at reasonable times, by any person desiring to do so, at reasonable times, under reasonable conditions, and under supervision by the custodian of the records or his designee. . . .
It can hardly be questioned that the Public Service Commission itself falls within the comprehensive definition of `agency' set forth in s. 119.011(2), F. S. See AGO 073-344. Since the rate organizations are established by commission approval for the purpose of developing tariff proposals and submitting recommendations to the commission for final approval, it is my opinion that a rate organization also falls within the statutory definition of `agency,' as a `private agency, person, partnership, corporation, or business entity acting on behalf of any public agency.' The agency's records would clearly fall within the definition of `public records' which includes records (in any physical form) `made or received . . . in connection with the transaction of official business by any agency.'
Prepared by: Staff